ABRAHAM RICH AND JAMES HARRIS, CLAIMANTS OF THE SHIP MARTHA, HER TACKLE, APPAREL, AND FURNITURE, APPELLANT, *v.* CHARLES LAMBERT AND ROBERT LAMBERT, COPARTNERS, TRADING UNDER THE FIRM OF LAMBERT AND BROTHER, AND OTHERS. SAME *v.* SOUTH CAROLINA RAILROAD COMPANY.

Where several owners of a cargo filed libels *in rem* against the vessel for damages done to the goods, and these libels were consolidated by order of the court, which afterwards decreed damages in favor of the libellants, in some cases to more and in some to less than $2,000, those cases where the damages are less than that sum must be dismissed, on an appeal to this court, for want of jurisdiction.

Where further evidence was taken after the appeal to this court was entered, under the authority of an act of Congress passed in 1803, (2 Stat. at Large, 244,) the issuing of the commission by the clerk of the Circuit Court, and the uniting by both parties in its execution, furnish a presumption that the proper order was given. If not, the parties have waived all objection.

Where goods on board of a ship received a damage which must necessarily have accrued during the voyage, the *onus probandi* is upon the master and owners to show that it was occasioned by one of the perils of navigation within the exception of the bill of lading.

The master is not to blame for bringing sacks of salt between decks, if it be well stowed and packed, and secured with proper dunnage. The usage of trade is to carry salt in that way.

The evidence in the present case shows that the damage was caused by the perils of navigation.

THESE two cases were included in the same judgment of the Circuit Court of the United States for the District of South Carolina, and were argued together in this court, upon an appeal from that judgment.

Rich et al. *v.* Lambert et al.

Originally, ten several libels were filed by the owners or consignees of goods shipped on board the Martha at Liverpool, bound to Charleston. The libels claimed damages on account of injury to the property by the negligence or misconduct of the respondents, and particularly that a large quantity of salt was improperly stowed. The proceeding was *in rem* against the vessel, in the District Court of the United States.

Richard Rich, captain of the ship, intervened for himself as master, and for the owners, Abraham Rich and James Harris of Massachusetts, and Samuel Snow of Maine.

The answers denied all charges of neglect and mismanagement, and averred that all the cargo on board was well and securely stowed according to the usage of shipping; that the ship was sound, stanch, and every way fitted for the voyage; that she encountered severe gales and heavy seas on the voyage, and made much water, and in consequence thereof, and of the leakage of the ship, and the change of latitude and consequent warm weather, the water so taken in became warmed and was converted into steam, and caused a damp atmosphere to pervade the lower hold of the ship, which no power, care, or diligence, on the part of the master, could have avoided, but that the same was the inevitable result of the ordinary dangers of navigation, &c.

The answers further aver, that the salt on board was stowed on the second deck, where it was necessary to be stowed in order to steady the ship and prevent injury to the cargo in the hold; that access between that deck and the hold where the libellants' goods were stowed, was wholly and effectually cut off, and was independent of the cargo in the hold, and could have no effect upon the same more than if it had been stowed in another ship; that the salt was well stowed in the ordinary and customary part of the ship, according to the approved usage of vessels trading to the United States from Liverpool.

Nine of the ten separate libels were ordered by the court to be consolidated. The tenth case, in which the South Carolina Railroad Company were libellants, was not included in this order.

A trial was had in the District Court upon libels, answers, and proofs, which resulted in the passage of a decree in favor of the libellants, awarding to them, separately, the following sums of money:

| No. 1 | Claim of | Lambert & Brother | | | | $2,077 | 39 |
|-------|----------|-------------------|---|---|---|-------|----|
| " 2 | " | John Graveley | | | | 447 | 90 |
| " 3 | " | Barnwell & Ravenel | | | | 1,628 | 42 |
| " 4 | " | A. Moffett & Son | | | | 136 | 97 |
| " 5 | " | W. & J. E. Adger | | | | 868 | 29 |

Rich et al. v. Lambert et al.

| No. 6 | Claim of | A. Gordon | | | | | $442 34 |
|---|---|---|---|---|---|---|---|
| " 7 | " | W. L. Timmons | | | | | 806 77 |
| " 8 | " | Dick & Crews | | | | | 350 02 |
| " 9 | " | Morton & Courtney | | | | 214 64 |
| " 10 | " | Jas. Adger & Co. | | | | | 623 40 |
| " 11 | " | S. N. Hart | | | | | 368 02 |
| " 12 | " | Watson & Johnston | | | | 460 26 |
| " 13 | " | Roosevelt, Hyde & Clark | | | | 172 09 |
| " 14 | " | S. Mowry & Son | | | | | 173 69 |
| " 15 | " | South Carolina Railroad Company | | | 2,045 11 |
| | | | | | | | $10,815 31 |

From this decree, the claimants appealed to the Circuit Court, where further evidence was heard, and the decree of the District Court affirmed, with the further addition of $774.90, which had in the interim been paid to the respondents by the South Carolina R. R. Company.

The respondents appealed to this Court, and after the entry of the appeal took further evidence under the act of Congress of 3d March, 1803. 2 Stat. at Large, 244.

It was argued by *Mr. Evans* and *Mr. Hunt*, for the appellants, and by *Mr. Coxe* and *Mr. Butler* for the appellees.

The points made by the counsel for the appellants were the following:

The allegation in the libel is that the ship was loaded between decks with a quantity of salt in bags; that the goods damaged were stowed in the lower hold, under the middle deck, and that the salt, between decks, leaked and passed through the deck, and damaged the goods.

Unless this proposition is established as a fact, the libellants have no case. The ground taken is, that such stowage was unskilful and dangerous, and therefore the storms and tempests, which were proved to have occurred, will not excuse this unseamanlike and dangerous stowage.

This leading allegation of the libellants is denied, and it is contended that the proof establishes, —

I. That, in point of fact, the salt did not leak or drip any brine upon the goods in the hold, for these reasons:

1st. That the bags, when unloaded, were dry.

2d. That the dunnage was dry.

3d. That the surface of the between-decks was unstained around the piles of salt.

4th. That the quantity of salt water, which all admit was necessary to produce the injury, say, "many hogsheads," could not, in the nature of things, have deliquesced from the salt, between decks, without wetting the bags and decks. The hatches being found tight, and being higher than the surface of the deck, the brine, if any did leak, must have gone through the seams of the second deck, and yet no external stain was found around the piles of salt.

II. That the stowage was seamanlike and necessary; the weight of the salt being required to steady the ship.

III. That the decks were well calked when the voyage commenced; and if any injury had occurred, it is solely attributable to stress of weather. This point was partially established by the testimony taken before the district and circuit judge, but has since been put beyond controversy by the examination of the ship-carpenter, taken by commission, and now introduced for the first time, so that the case of the claimants depends upon these two propositions: 1st. That the salt stowed between decks did not, and in the nature of things could not, have caused the damage. 2d. That the stowage, under the circumstances, was well warranted by the usage in such instances, and if any damage was caused by it, it resulted from a change of facts produced by heavy storms and working of the vessel.

IV. These being established, the next important proposition is, that the storms and waves, as fully proved to have been met on the voyage, is the only remaining cause of loss, and is a risk which falls on the insurer, and not on the carrier; as we contend that, as soon as the liability of the insurer begins, that of common-carrier ends.

Certainly, if on the inception of the voyage, the cargo was properly stowed, and the vessel sea-worthy, the allegations being identical and confined to one fact, the stowage of the salt, we must look to the answer which raises the issue.

The issue is raised in the pleadings by the allegations by libellants, that certain salt stowed between decks was the cause of injury, by the salt dripping in large quanties through the second deck, and injuring the goods stowed in the hold; and a full or unequivocal denial, by claimants, that said salt was improperly stowed, and especially, that it was delivered safely in Charleston, dry and in good order, and that none but the goods in the hold were injured, and fully accounted for by the dangers of the seas.

This issue is to be resolved by the testimony, which, on behalf of the libellants, failed in any positive proof that the salt caused the injury, or that it was unseamanlike stowage.

The counter proof was positive. The admitted fact that the

salt was found dry on opening the hatches, not a stain on the lower bags, no marks of brine from the pile of bags, all rendered it a physical impossibility that a large quantity of brine had leaked out during the voyage; and, consequently, being impossible, it was not true.

The witnesses may be divided into the following classes:

1. Those who examined the vessel when the hatches were taken off, and broke out the cargo.

2. Those who state the usages of shipmasters to prove the salt well stowed.

3. The crew and captain, and the new testimony of the ship-carpenter, to prove the vessel was stanch, and particularly that the decks were well calked, and but for the storms the goods would have been safely landed.

The testimony was then examined.

The counsel for the appellees contended: —

1st. That so far as regards the eight libellants, to whom these decrees award sums less than $2,000, the appeals should be dismissed for want of jurisdiction. The interest of these parties are wholly distinct and independent; as such they were presented in separate libels; as such they were established by independent evidence; as such they were reported on by the clerk; and as such they are adjudicated upon by both the District and Circuit Courts.

The decisions of this court have established this principle so far as the interests of the claimants are separable. Oliver *v.* Alexander, 6 Pet. 143; Stratton *v.* Jarvis, 8 Id. 11; Spear *v.* Place, 11 How. 522.

2d. On the merits. There does not seem to be any contrariety in the evidence as to the principal fact in the case, viz., that the goods of the libellants sustained damage during the voyage from Liverpool to Charleston. The main question which presented itself was as to the cause of that damage.

The following points are established by the evidence:

1. The goods were shipped in good order and condition, as shown by the bills of lading. Benjamin *v.* Sinclair, 1 Bailey. S. C. Rep. 174.

2. That they were damaged when delivered at the port of discharge.

3. This throws upon the carrier the burden of showing that the injury resulted from some cause for which he is not responsible. Forward *v.* Pittard, 1 T. R. 27; Story on Bailm. 509; 2 Kent's Com. 602; 1 Bing. 607.

4. The evidence shows that this injury did not result from a storm or the dangers of the seas, for the vessel appears to have sustained no injury.

5. It did result from the salt which was on board between decks.

6. The evidence is not, when properly examined, contradictory, but if so, it preponderates against the appellants.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States, held in and for the District of South Carolina in admiralty.

The several libels were filed in the District Court, against the ship Martha, by the owners of cargo brought in the same from Liverpool to Charleston, for damage done to the goods in the course of the voyage.

Five of the separate owners of cargo joined in one of the libels, and each of the others filed separate libels; to each of which answers were put in by the respondents, and the parties proceeded in the usual way to take their proofs. Pending the proceedings, all the cases were consolidated by an order of the court on the motion of the proctors for the libellants.

The District Court held the respondents liable, as carriers, for the damage done to the goods; and referred the cases to the clerk to take the necessary proofs, and ascertain the loss which each of the several parties had sustained, and report the amount, which was done accordingly. And, in the coming in of the report, a decree was entered adjudging to each of the fifteen several owners the amount of the loss they had respectively sustained.

On an appeal by the respondents to the Circuit Court, this decree was affirmed. And the cases are now before us on an appeal to this court from that decree.

With the exception of two of the cases, the sum decreed against the respondents in favor of the several owners of the cargo is below the amount that authorizes an appeal to this court. And, it is insisted, on the part of the appellees, that the appeal should be dismissed for want of jurisdiction as to all parts of the decree, except the part relating to the two cases mentioned.

On the part of the appellants, it is contended, that the objection to the jurisdiction is not available to the five separate owners joining in the libel, as the aggregate amount decreed to them exceeds two thousand dollars; nor to any of the parties, on the ground that all the cases were consolidated by the orders of the District Court on the motion of the proctors for the libellants.

We are of opinion that neither of these grounds are sufficient to maintain the jurisdiction, and that the appeal must be dis-

missed as to all the cases except the two in each of which the amount in the decree exceeds the two thousand dollars.

The joining of several owners of cargo conveyed in the same ship in a libel *in rem* for damages done to the goods in the course of shipment, and the consolidation of libels filed separately by the respective owners for like damage, is allowed by the practice of the court for its convenience, and the saving of time and expense to the parties. It is a practice deserving commendation and encouragement in all cases where it can be adopted without complicating too much the proceedings, and thereby prejudicing the rights of the parties.

In cases where the several claims against the ship are founded upon a common injury and loss, the questions involved depending upon the same general rules of law, and the same evidence, equally applicable to all of them, it is fit and proper that the proceedings should be joint, either by allowing the parties to unite in the libel, or by an order for consolidation, if separate suits have been instituted.

The defence will usually be the same in all the cases; but, if otherwise, the parties will not be prejudiced, as they may avail themselves in the answers of any defence existing against either of the several owners. For, although the proceeding assumes the form of a joint suit, it is in reality a mere joinder of distinct causes of action by distinct parties, arising out of a common injury, and which are heard and determined, so far as the merits are concerned, the same as in the case of separate libels for each cause of action. The same decree, also, is entered as in the case of separate suits.

We do not perceive, therefore, any ground for a distinction as to the right of appeal from a decree as entered in these cases from that which exists where the proceedings have been distinct and separate throughout. Clearly, a libellant could not have appeal, unless his claim exceed two thousand dollars. Nor can the respondent, upon the same principle, unless the amount decreed against him in the particular case, exceeds that sum. The principle, in effect, we think, has been already decided in this court. 6 Pet. 143; 8 Id. 11; 11 How. 522.

There is another preliminary question which it is necessary to notice before proceeding to the merits.

Further evidence has been taken, on the part of the respondents, since the appeal to this court was entered, which is objected to by the appellants.

The act of 3d March, 1803, (2 Stat. at Large, 244) allows additional evidence to be furnished by either party before this court in cases of appeals in admiralty and prize causes. And by the 27th rule of the court the evidence is to be taken under a

commission to be issued from this court, or from the Circuit Court, under the direction of any one of the judges thereof.

The objection taken to the evidence is, that it does not appear from the record that any order was obtained from either court for the issuing of the commission. We have, however, before us the commission itself, issued in the usual form by the clerk of the Circuit Court, and in the execution of which both parties have joined. An order, therefore, must have been entered, or, if not, it was waived by the act of the parties in suing out the commission, and joining in its execution. For these reasons we think the further evidence furnished to this court admissible.

This brings us to the merits of the case.

The different libels filed in the several cases are in form and substance the same. And so are the several answers of the respondents.

The libels charge that the ship Martha being at Liverpool on the 6th September, 1847, and bound on a voyage to Charleston, the libellants caused to be shipped on board the same, divers goods, wares, and merchandise, then in good order and condition, of great value, &c., to be taken care of and safely delivered in like good order and condition, (the dangers and accidents of the seas and navigation excepted,) they paying certain freight therefor as per bills of lading. That afterwards, on or about the twenty-first of the same month, the said ship, having on board the said goods, set sail from Liverpool, and on the ninth November following arrived at Charleston, and soon thereafter delivered the same to the said libellants.

That the said goods, wares, and merchandise were not taken care of and safely carried and delivered according to the tenor and effect of the bills of lading; but, on the contrary, although no damage accrued from any dangers or accidents of the seas, or navigation, the said goods were so badly taken care of by the said master, and the cargo of said ship, and particularly a quantity of salt on board thereof was stowed so improperly, that through the neglect, and mismanagement of the master, the said goods were greatly damaged, and great loss thereby sustained.

The answers of the respondents admit the taking on board of the vessel the goods as stated in the libels; and allege, that she was loaded with an assorted cargo in the hold and with sundry sacks of Liverpool salt between decks; that the ship was sound, stanch, and in every way well fitted and equipped for the voyage, and capable of carrying safely the cargo taken on board, the dangers of the seas only excepted. That the cargo was well and securely stowed and packed with proper dunnage, and according to the usage, and custom of the trade, by the master and officers of the ship; that the hatches leading from the be-

tween-decks and the lower hold were well secured and calked, wholly separating the one from the other.. That the ship encountered several violent gales, and very boisterous weather during her voyage, causing her to labor heavily, and straining her badly, the sea at times breaking over her, so that she shipped a great deal of water from leaks, and stress of weather, requiring the constant use of the pumps, which were faithfully attended to, and every effort made to preserve the ship, and save the cargo from damage.

The respondents further allege that in consequence of the heavy seas, and the leaking of the vessel, and the change of latitude from a cold to a warm climate, the water shipped became heated, producing steam, and a wet and damp atmosphere in the lower hold, which no care or diligence, on the part of the master and crew could have prevented; that this was the unavoidable result of the dangers of navigation, and proceeded from the storms, winds and waves; and not from any defect in the ship or want of skill, care or diligence on the part of the master and hands, and caused the damage to the goods complained of.

They further say, that the salt stowed between decks was safely carried, and delivered dry and in good order at Charleston, without being wet, or any evidence of drainage from the same either upon the sacks, the dunnage, and matting upon which the sacks were stowed, or upon the lower deck, through the seams of which the drainage must have passed to the goods in the hold, if at all; and they deny that the damage to the goods in the hold proceeded from the salt thus stowed between decks.

The proofs in the case show, that a mixed cargo, consisting of crates, and boxes of dry goods, and hardware, and a quantity of bars of railroad iron, was stowed in the hold of the vessel, the railroad iron placed at the bottom. And, that some twelve hundred sacks of salt were stowed between decks fore and aft the main hatch of the lower deck. That she left Liverpool on the 21st September, 1847, and arrived at Charleston on the 9th of November following, after a passage of forty-nine days; that during the voyage she encountered on the first and second of October two very violent gales, the vessel on the wind at the time, causing her to roll heavily and the sea to break continually over her, and to ship great quantities of water, so that it was necessary to keep the pumps going most of the time while the storm continued.

On opening the upper hatches a day or two after the arrival of the vessel for the purpose of discharging the cargo, the salt between decks was found dry and in good condition; and, after the discharge of the same, no unusual wet or dampness appeared upon the matting or dunnage upon which it was stowed, nor

upon the flooring of the deck, nor any evidence of drainage from the sacks of salt in any part of the between-decks. All the witnesses concur on this point who had the best opportunity of becoming acquainted with the facts; and whose connection with the discharge of the salt precludes the possibility of mistake, including the port-warden present at the opening of the hatches, the purchasers of the salt, the consignee, the stevedores, the inspector of the customs, and the mate of the vessel. Nor is there any evidence in the case to the contrary.

On opening the hatches of the lower deck, leading to the hold of the ship, which was about the 15th November, five or six days after her arrival, great heat issued immediately therefrom, and much dampness and vapor were found to pervade this part of the vessel; and on breaking the cargo and commencing the discharge, the greater portion of it was found seriously damaged.

The boxes of dry goods were found wet, or damp, and stained to a very considerable extent, and the hardware, and bars of railroad iron, wet and badly rusted; and indeed, the whole cargo throughout the hold more or less damaged. Drops of water, or vapor, apparently formed from the heat and dampness of the hold, or by drainage from above, were found pendant from the seams of the under part of the lower deck, affording very satisfactory evidence of the immediate cause of damage to the cargo; but, leaving the question open to controversy as to the source whence these indications proceeded; some of the witnesses, and among them three of the port-wardens, testifying that these drops proceeded from the drainage of the salt that had been stowed between decks, and others, from the heat and dampness of the hold, aggravated by the quantity of sea-water shipped during the storm, and stress of the vessel

We have already stated, that the libellants charge in the several libels the damage to the goods to have been occasioned exclusively from the improper stowage of the cargo, and especially of the sacks of salt in the between-decks over the goods in the hold of the vessel. This is denied in the answers, and as the recovery must be had, if at all, according to the allegations in the pleadings, it is incumbent on the part of the libellants to maintain this ground by the proofs, in order to charge the respondents.

The real questions in the case therefore, are, 1. Whether or not the respondents were guilty of neglect, and mismanagement in the stowage of the cargo, and especially of the stowage of the sacks of salt between decks? And, 2. If they were, whether the damage to the goods in the hold of the vessel was properly attributable to this cause?

The goods having been found to be damaged on the arrival

Rich et al. v. Lambert et al.

of the ship, and which must necessarily have accrued in the course of the voyage, the burden devolved upon the respondents to show, in order to excuse themselves, that it was occasioned by one of the perils of navigation within the exception in the bill of lading. That burden they have assumed; and have shown by nearly an unbroken current of testimony, that the conveyance of the salt between decks, in a mixed cargo, was according to the established custom and usage of the trade between Liverpool and this country; and that it was well stowed, and packed, and secured with proper and sufficient dunnage.

This ground, therefore, for charging the respondents with the damage to the goods, entirely fails.

They have shown further, that the vessel encountered severe gales and boisterous weather in the course of her voyage, during which she labored heavily, the sea frequently breaking over her, and much water shipped by stress of weather, so that it was necessary to keep the pumps in constant operation to preserve the vessel, and protect the cargo. Thus presenting a state of facts, in connection with the condition of the hold, and appearance of the goods on the opening of the hatches, when the vessel arrived at her port of destination, that might well account for all the damage by reason of the perils of the navigation.

It is to be observed also, that even assuming, according to the theory of the libellants, the damage was occasioned by the drainage of the salt coming in contact with sea-water, if the water was shipped from the violence of the storm, or stress of weather, as there was no fault chargeable to the master as to the place of stowage or as to the stowage itself, it is apparent, that even in that aspect of the case, the damage would still be attributable to the perils of the seas, and not to the fault of the master or ship.

In order to avoid these necessary conclusions the learned counsel for the libellants have sought to maintain upon the proofs, that the seams of the lower deck were not properly calked, but were open, so that the drain from the salt readily dripped through upon the cargo in the hold; and, that conceding it to have been properly stowed between decks, if the seams of the deck had been tight, the damage would not have happened.

Assuming the facts to be true, as contended for in this proposition, the conclusion is admitted. But if the opening of the seams was occasioned by the straining of the vessel in the storms encountered during the voyage, and in favor of which view there is much evidence in the court below, the respondents would still not be answerable. The further proof taken on this appeal would seem to remove all doubt on this point that may have previously existed.

That shows the ship, when about to sail from Liverpool, was inspected by a competent ship-builder, and repaired; and among other repairs, her lower deck was well calked and payed where any defects were discovered, and put in good order. The fact, therefore, that the seams were open on the arrival of the vessel, if admitted, must have happened in the course of the voyage, and may be fairly attributable to the storms she encountered.

But, it is not important to pursue this inquiry. For, the proofs in the case show beyond all reasonable doubt, that the damage could not have been occasioned by any drainage from the sacks of salt between decks. We have already referred to the witnesses on this point, and need not repeat the evidence.

The salt was taken from the stores at Liverpool, and not from lighters, and was dry when put on board, and also, when discharged at Charleston; and there was not the slightest indication of unusual wetness or dampness upon the sacks or the matting and dunnage upon which it was stowed, or upon the flooring or any part of the between-decks. On this branch of the case there is no contrariety or discrepancy in the evidence.

And all the witnesses concur who speak on the subject, and common observation confirms their conclusion, that, if the water came from drainage of the salt, so as to occasion the damage to the goods, some traces of its effects would have been found upon the sacks, and upon the mats and dunnage and deck of the vessel.

The only ground urged for a contrary conclusion is an inference drawn from the fact that drops of water of a brackish taste, indicating, as supposed, the presence of salt in a degree, beyond that of sea-water, was found along the seams underside the lower deck; and of salt in the concrete found upon parts of the cargo in the hold. From these circumstances alone, three of the port-wardens out of four, expressed the opinion that the damage must have been occasioned by the drainage of the salt above, notwithstanding the decisive facts as to the condition of the salt when put on board, and when discharged, and the absence of any traces of it in the between-decks.

It would be exceedingly difficult, if not impossible, to reconcile this opinion with the facts of the case, even if there was no other way to account for the circumstances stated, on which the opinion of the port-wardens was founded.

But when all of them may be accounted for as the natural, if not necessary effect, of the presence of the quantity of sea-water shipped by stress of weather in the course of the voyage, wetting the cargo as the vessel rolled and labored during the storms she encountered, producing great heat, and dampness in the hold, we think the opinion altogether unsupported by the evidence.

As to the appearance of salt in the concrete upon parts of the goods, it is quite probable, that the water in the hold thrown up the sides by the labor of the vessel in the gales may have brought it in contact with the salt between her timbers, and thus leaving traces of it upon the goods.

Most of the vessels that have been built for many years, particularly eastern vessels, are filled with salt between their side timbers and outside and inside plank or ceiling, up to the air-streak, for the purpose of preserving the timbers, and preventing them and the planks from shrinking. When water comes in contack with this salt either through the small openings below, or air-streak above, or otherwise, the tendency of it is to settle down in the space it occupies, by becoming more compact; and when the ship makes water in the hold, and rolls heavily by stress of weather, throwing the water up the sides, portions of the salt may escape from the small openings below and pass off along the water-way each side of the keelson to the well-pump. This, however, as is apparent, can happen rarely, if at all except when the ship labors heavily after having shipped much water in consequence of rough and boisterous weather. The effect of the salt, from its inherent tendency to attract and absorb moisture, is to tighten the seams of the ceiling, rather than open them, and thus prevent any escape of the particles of salt through them.

It has been suggested, that, assuming the presence of salt in the hold may be properly accounted for in the way above stated, this should be considered as evidence of fault in the ship, so as to charge the respondents.

But in the first place, to permit the libellants to recover upon this ground would be a departure from that upon which they have chosen to place their right of action in the pleadings. That is founded exclusively upon their improper stowage of the salt between decks; and the proofs in the case, have been taken with reference to the issue upon that allegation.

In the next place, there is no evidence before us of any defect or fault in the vessel in respect to the ceiling or other parts of her connected with the process of thus salting the timbers. On the contrary, the port-wardens, themselves, speak of the seams of the ceiling as being tight and in good order.

The truth is, that all the cases proceeded below, on the part of the libellants throughout, upon the allegation in the libels that the damage was occasioned by drainage from the sacks of salt between decks, where, as supposed, it was improperly stowed. And the evidence in the record in respect to the condition of the ceilings and other parts of the hold of the vessel, was mere incidental and casual, no point having been made in the proofs on that subject.

We have already expressed our views upon this the main question involved in the case, and are satisfied, that the damage could not have been occasioned for the cause set forth in the libels; but happened from the perils of the navigation. We will simply add, what was omitted in the proper place, that nearly all the witnesses concur who speak on the subject, that the goods in the hold were most damaged by wet and dampness at the bottom, or lower tier, and diminishing in the advance to the upper. And that in many instances, the boxes of goods, and crates of hardware were wet, or very damp, and stained at the bottom, and dry and sound on the top and sides, confirming the view that the damage proceeded from below.

Our conclusion is, that the decree of the court below is erroneous, and must be reversed with costs, as to so much as awards damages to T. Lambert & Brother, and to the South Carolina Railroad Company, and that the proceedings be remitted to the court below with directions to enter a decree in favor of the appellants with costs; and as to the residue of the decree the appeal is dismissed for want of jurisdiction.

Mr. Justice DANIEL dissented.

This case is one of a class over which, according to my opinion, heretofore repeatedly expressed, the admiralty courts of the United States have no jurisdiction under the Constitution. It is the case of a contract entered into upon land, that is, in the city of Liverpool, to be fulfilled, partly, nay, chiefly on land; that is, by the delivery of merchandise in the city of Charleston. The remedy for the infraction of this undertaking, if any had in reality existed, would have been an action in a court of common law, upon the bill of lading, the written evidence of the undertaking of the carrier. In the exposition made by the court, of the evidence, as explaining the origin and character of the injury complained of by the libellants, I entirely concur.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of South Carolina, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit court in this cause, be, and the same is hereby reversed with costs, and that this cause, be, and the same is hereby remanded to the said Circuit Court for further proceedings to be had therein in conformity to the opinion of this court.