## THE PORTUENSE.[1]

### JOHNSON et al. v. THE PORTUENSE.

*(District Court, S. D. New York. June 16, 1888.)*

SHIPPING — CARRIAGE OF GOODS—BILL OF LADING—EXCEPTIONS—SWEATING—
HEAT—BURDEN OF PROOF—EVIDENCE.

Libelants shipped a quantity of Brazil nuts from Para to New York under a bill of lading which excepted liability from "damages arising from sweating, heat, steam," etc. On discharge at New York the nuts were found damaged by the heat and sweat engendered on the voyage. The evidence indicating that the nuts were stowed in the customary manner, that they belonged to that portion of the crop especially liable to become heated, that they were carefully watched and ventilated when possible on the voyage, and that tempestuous weather necessitated keeping on the hatches during the last three days of the voyage, *held*, that libelants had not sustained the burden which was on them to show negligence in the vessel, and without such proof of negligence the ship was protected from liability by the exceptions of her bill of lading.[2]

In Admiralty.

*Biddle & Ward*, for libelants.

*Owen & Gray*, for claimants.

BROWN, J. On March 2, 1887, the British steamer Portuense arrived at New York from Para with a cargo of Brazil nuts. A large quantity belonging to the libelants, stowed in the lower hold under hatch No. 2, was found badly damaged, some 75 per cent. being worthless. This libel was filed to recover for the damages.

The bill of lading in its first part recites the receipt of the nuts at Para in good order. Afterwards it states, "Quality and condition unknown." Among the numerous exceptions are "damages arising from sweating, heat, steam," etc. The testimony shows that it is usual for some sweat, heat, or dampness to damage the nuts; but that generally their effects are chiefly superficial, without injuring the internal quality of the nuts or their market value beyond a small percentage; although there is occasionally a considerable loss on new and raw nuts, like these, shipped early in the season. In this case the sweat and steam appear to have been much greater than usual. When the hatches were opened the steam came out in clouds; and much heat was found to have been produced in the upper parts of the hold. The nuts belonging to other consignees which were stowed beneath the libelants' nuts turned out of an average quality. The libelants' nuts, which were on the top, were largely in the condition called by the stevedore "cooked," being whitish on the outside, and soft within. From all the circumstances I have no doubt

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

[2] As to how far a common carrier may limit its common-law liability by contract, see Railroad Co. v. Thomas, (Ala.) 3 South. Rep. 802, and note; Railroad Co. v. Sherrod, (Ala.) 4 South. Rep. 29; Railroad Co. v. Smitha, (Ala.) 4 South. Rep. 708, and cases cited in note; Glenn v. Express Co., (Tenn.) 8 S. W. Rep. 152; Railway Co. v. Trawick, (Tex.) 4 S. W. Rep. 567.

that this injury was produced by the heat and sweat engendered upon the voyage. These causes of loss, however, being expressly excepted in the bill of lading, the ship is not liable, unless it appears that the steam and heat arose from some negligence or want of proper care by the ship, such as bad stowage, insufficient means of ventilation, or keeping the hatches too close on the voyage; or that, by proper attention, any injury from the heat and steam might have been avoided. The burden of proof to show this is upon the libelants. *Clark* v. *Barnwell*, 12 How. 272, 280, and other cases cited in *The Vaderland*, 18 Fed. Rep. 740.

In the case of *The America*, 8 Ben. 491, and in that of *The Star of Hope*, 17 Wall. 651, to which the attention of the court has been called, it was found as a fact that the stowage was bad, and that the usual provisions for ventilation were neglected; and the ship was consequently held liable. In the present case there is no direct evidence to this effect; on the contrary, the only direct testimony upon the subject is to the effect that the nuts were stowed in compartments in the usual manner; that the most approved methods of ventilation were adopted, there being in compartment No. 2 a horizontal shaft below communicating with two extra vertical ventilating shafts; and that all the space that was usually left between the top of the nuts and the deck above was left open. Shipments of similar Brazil nuts to New York are made in large quantities in the same manner, and ordinarily with little loss.

The testimony, moreover, does not show any lack of attention to the cargo on the voyage. Constant watch of its condition was maintained; the hatches were wholly removed in the day-time, when the weather would permit it, and in part at night. The heat of the cargo was observed, but no steaming, until near the close of the voyage, when tempestuous weather made it necessary to keep the hatches closed for nearly three days. The only explanation the master could give was the considerable quantity of nuts in the No. 2 compartment, viz., 230 tons; and that the nuts were new; and the bad weather of several days, during which the hatches had to be closed. The proof shows that nuts belonging to the first of the season's crop, namely, in February, are more liable to become heated than those shipped later. Although the master of this vessel had not previously carried so many nuts in the same compartment, the proof shows that it was not unusual to carry a much larger quantity without much injury, and with the same stowing and methods of ventilation. Stowage in the customary manner is sufficient. *The Chasca*, 23 Fed. Rep. 159, and cases there cited.

The libelants contend that damage to the extent of 75 per cent. is so extraordinary as to afford a strong presumption of negligence. If the whole amount stowed in compartment No. 2 be considered, the percentage of loss, however, is very much less than that. The libelants' goods in this compartment were only about 50 tons out of the 230. They received the most damage because they happened to be all on top. Computing upon the whole contents of the compartment, the damage does not appear to have been above 18 or 20 per cent. In the forward compartment the libelants' goods came out sound. Their goods in the second

compartment, when shipped, were inferior in quality to those in the first compartment. No known means of ventilation, or of care of goods upon the voyage, are shown to have been neglected. Had the stowage of 230 tons in compartment No. 2 been proved to be unusual, or excessive, or known by previous experience to be attended with special danger, or to require more of the special appliances for ventilation than were employed in this case, negligence in the vessel might be found; and proof of those facts, it must be assumed, could and would have been produced on the trial. No testimony to that effect is produced on behalf of the libelants, and I cannot interpret the master's statements as in the least equivalent thereto. The shippers also seem to have had a representative present at the loading, who must have been acquainted with the facts of the mode of stowage and of ventilating. No objection was made thereto; and there is no evidence of apprehension by any one of injury beyond the ordinary amount of damage in transportation, or the risks incident to new fruit shipped early in the season. As there is no sufficient evidence, therefore, of improper stowage, or want of proper care, the libel must be dismissed.