## THE LA DROME (three cases).

District Court, S. D. New York.
May 2, 1923.

Bigham, Englar & Jones, of New York City (Henry B. Potter, Ezra G. Benedict Fox, and Raymond S. Stocking, all of New York City, of counsel), for libelants.

Joseph P. Nolan, of New York City, for claimant.

AUGUSTUS N. HAND, District Judge.

The foregoing libels were filed for sweat damage to walnuts shipped from Bordeaux to New York on the steamship La Drome. The Jaburg walnuts were shelled and the other walnuts were unshelled. The defense relied upon was that damages occasioned by sweating of the ship or by inherent nature of the cargo were excepted in the bills of lading. The exception was as follows:

"Rule 2.—The shipowner is not responsible for the damages, averages and losses caused * * * (4) by vermin, rats, worm holes, rust, sweat, decomposition, wastage during the voyage or shrinkage in quantity inherent in the nature of the merchandise, breakage, heat, rain, effects of climate, oxidation of the effects resulting from these causes, damages at discharge or damages inherent in the nature of the merchandise shipped. * * * "

It has been established that the shipments were received in good order as recited in the bills of lading. On discharge, the cases and bags containing the nuts were found to be heavily wet from sweating of the steamer.

The La Drome was a steel screw steamer of a gross tonnage of 3,236 tons and a net tonnage of 2,102 tons, having four cargo holds and four between-deck cargo compartments. There were two ventilators for each of the lower holds and for each 'tween-deck compartment. The walnuts were stowed in each of these places. The passage took from November 16, 1915, to December 13, 1915, about double the usual time. The hatches into the lower holds were covered by the cargo in 'tween-decks so that they could not be and were not opened during the voyage, and the upper hatches were only opened so far as the evidence discloses on four days out of the twenty-eight while the vessel was at sea.

In my opinion the contention that the exception of sweat related only to sweat from the cargo and did not include sweat from the ship involves too narrow a construction of the bill of lading. To qualify and limit the word "rats" just preceding "sweat" by the words "inherent in the nature of the merchandise" would be quite unreasonable, and so is a limitation of "sweat" to "sweat" from the merchandise itself.

The libelants say that the stowage was improper because:

(1) The hatches were not opened as often as practicable to ventilate the cargo.

(2) The ship was not equipped with sufficient ventilators for a cargo of nuts and was consequently unseaworthy in respect to the cargo carried.

(3) There was no dunnage between the tiers of bags which lay on one another.

(4) There was no sheathing in holds 2 and 3, and in these holds the cargo was only separated from the steel skin of the ship by batten boards, whereas in holds 1 and 4, where less damage from sweat occurred, the ship was incased in wood.

I think the determination of when the hatches could be safely opened was a matter almost wholly within the discretion of the master of the vessel. The court could only reverse his judgment upon incomplete and necessarily doubtful information as to weather conditions during the voyage and upon the opinion of experts based upon uncertain facts. Everything is in favor of supporting the judgment of the navigator of the ship who knew the conditions that confronted him and had to make the decisions. Nothing but the clearest abuse of discretion justifies a finding after the event that the master should have opened the hatches when he at the time thought it unwise and unsafe to do so. I am not satisfied that the discretion of the master was not properly exercised, and therefore find no fault because of failure to open hatches. Windsails could not be used in cases where hatches could not be safely opened.

I see no reason for contending that the hatches from 'tween-decks to the holds should be opened in the case of any freighted vessel. They could not be opened during a voyage, as they are ordinarily covered, as here, with the cargo.

The ship was a comparatively small vessel, and two ventilators for each hold were,

in my opinion, sufficient for reasonable ventilation of the cargo space to be ventilated.

 In respect to lack of dunnage, there is no contention that there was not dunnage on the floors of the holds and 'tween-decks, and the evidence is that there was dunnage in these places. Lack of dunnage on the ceiling of holds 2 and 3, and lack of dunnage between the tiers of bags where the bags of nuts were piled on each other or placed under other merchandise is criticised. Apparently the cargo in holds 1 and 4 suffered slightly less from the dripping of sweat from the ceiling than holds 2 and 3. This is because 1 and 4 had been incased in wood to carry powder and happened in that respect to have an absorbent ceiling about eight inches thick which could take up some of the sweat so that it did not as readily drip onto the bags. The roof of holds 2 and 3, on the other hand, consisted of nothing but the steel "skin" of the ship. The cargo was kept from the skin of the ship by batten boards, but these boards naturally could not prevent direct dripping on the cargo from the steel ceiling of the holds. The sacks of merchandise were piled one row lengthwise and the other row crosswise of the ship so as to permit ventilation. The batten boards in holds 2 and 3 each kept the cargo from the sides of the hold and also helped to ventilate. It is true that a certain amount of sweat was to be anticipated because of the season and the carriage of the cargo from a warmer into a somewhat colder climate, but, when the ship has once established that the damage was caused by sweat, it is for the libelant to show affirmatively that the damage could have been avoided by the exercise of reasonable care in respect to the custody and stowage of the cargo. While the damage was due to a greater change of weather than usual and to a much longer voyage than was to be anticipated, yet the danger of damage from sweat might, I think, have been anticipated and avoided. Dunnage mats such as are spoken of in The Dolbadarn Castle (C. C. A.) 222 F. 838, 842, would certainly have averted some of the damage to cargo. Some absorbent ought to have been placed in the holds calculated to take up the moisture where there was such a large cargo subject to injury by sweating. In The Star of Hope, 17 Wall. 651, 21 L. Ed. 719, the Supreme Court affirmed a decree for sweat damage caused by stowage of nuts in the holds instead of in cabin staterooms as directed by the shipper. I think dunnage mats, as well as better provision by way of dunnage for airing between the tiers of cargo, would have lessened the damage and ought to have been provided.

In the case of United States v. M. Levy's Sons et al., recently decided by the Circuit Court of Appeals for the Fifth Circuit, 288 F. 544, the voyage was from Brazil, a tropical climate, to New Orleans, so that the danger of sweat and the precautions necessary to be taken against it were perhaps somewhat greater than here. There the court sustained a decree for the cargo owners under circumstances closely resembling the present. The decision of Judge Brown in The Portuense (D. C.) 35 F. 670, relieved the ship, but the facts showed most careful stowage.

In view of the foregoing, I have reached the conclusion that there is proof of negligence in custody and stowage of cargo by reason of the failure to furnish proper dunnage, and I accordingly grant an interlocutory decree to libelants with the usual reference.