## THE NAGISAN MARU.

## THE SHOHEI MARU.

## PHILIPPINE SUGAR CENTRALS AGENCY et al. v. MITSUI BUSSAN KAISHA, Limited (two cases).

### District Court, S. D. New York.

### Feb. 19, 1936.

Single & Tyler, of New York City (Douglas D. Crystal, of New York City, of counsel), for libelants.

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Galey and Burton H. White, both of New York City, of counsel), for respondent and claimant.

PATTERSON, District Judge.

The first suit is for damage to a cargo of Philippine sugar carried on the ship Nagisan Maru. The second is for damage to a like cargo carried on the Shohei Maru. The two suits were tried together.

*The Nagisan Maru.*—This vessel took a cargo of sugar from Philippine ports early in December, 1932. On discharge at New York fifty days later some of the bags were found to be heavily stained and wet. The stains were described as black and syrupy, of the appearance of molasses. There were 1,390 of such damaged bags, bearing the marks "B E" and "I S C," out of 48,000 bags of these marks carried. The damaged bags were almost all from the bottom tier of the stow, and the stains were on the underside of the bags. Bags in the body of the stow were stained and somewhat damp, but were accepted as sound by the consignee. The damaged bags came from all five of the ship's holds.

The shippers claim that the moisture came from green boards used as dunnage. Two witnesses present at the discharge testified that the dunnage was unseasoned and wet. The weight of evidence, however, is to the effect that the lumber used as dunnage was seasoned and dry and could not have caused the damage that was found. There was sugar of other marks stowed vertically in each hold, of about the same number of bags; this sugar rested on the same kind of dunnage and came through without damage sufficiently serious to cause claim to be made for it. The Nagisan Maru was a new vessel and had the highest rating. At the port of shipment the holds were inspected by Lloyds surveyors and also by the shippers and were reported to be fit. The sugar was stowed in the usual manner. The dunnage consisted of two tiers of pine boards, the lower laid thwartships and the upper fore and aft, with a covering of burlap. The ship's of-

ficers had heard of damage claims on other ships carrying Philippine sugar and prior to taking on this cargo had taken extraordinary precautions for safe carriage. Stoves were put in to dry out the holds; burlap was used instead of mats on the dunnage, in the belief that burlap was better. The voyage was a long one, and for some days of heavy weather it was necessary to keep the hatches and ventilators closed; but whenever weather permitted, both ventilators and hatches were kept open. The shippers make no complaint of negligence in ventilation. No accident of any sort occurred during the voyage.

*The Shohei Maru.*—In this case the sugar involved bore the mark "B M." 48,-000 bags of this sugar were loaded in the Philippines January 23 to 26, 1933, being stowed in two of the four holds. On March 22d, the ship reached New York, where another lot of B M sugar stowed tweendecks was discharged. She then proceeded to Philadelphia and discharged the sugar from the holds on March 29th, 30th, and 31st. The suit is for some 2,000 damaged bags there unloaded.

In this case also the damaged bags were wet and heavily stained. They had the same appearance as the bags damaged on the Nagisan Maru. Most of them came from the bottom tier, although some were bags in the wings in upper tiers. The closest scrutiny by a competent surveyor for the shipper brought no criticism beyond the fact that he found what he called a dank condition on the lower side of some ceiling boards in the holds. It was shown by the carrier, however, that the boards were dry at the commencement of the voyage and that it is common to find the underside damp at the end of a long voyage, the boards being directly over the tank tops. The upper sides were dry, lime spread on the boards to catch moisture was dry, and the dunnage was dry. The other sugars in these holds, stowed from top to bottom, were not damaged.

The carrier showed also that the bags of B M sugar stowed tweendecks and discharged at New York had similar stains on the bottom bags, with lighter stains on the side bags, although no claim for damage was made. These bags were properly stowed and dunnaged.

The Shohei Maru was a new vessel, with the best rating. Surveyors in the Philippines who inspected the holds found them clean, dry, and fit for sugar cargo.

The stowage was good. There was dunnage of two tiers of boards, covered by mats. During the voyage the ventilation was as good as weather permitted.

The carrier also offered evidence tending to show that in a number of other shipments of Philippine sugar in 1932, 1933, and 1934, like damage in the way of wet and stained bags had been observed, nearly all of them in the bottom tiers, a condition not frequent before or since that period.

There is expert testimony relative to the keeping qualities of sugar. Where sugar is warehoused under poor conditions, bacteria and molds may set in, the amount of invert sugar will be increased, and with it the tendency to attract moisture. The process may continue until there is liquefaction, showing itself in stains on the bags. Sugar may also be rendered unfit at the factory by being bagged when warm. In such cases there will be migration of moisture from inside to outside. The keeping qualities of sugar bear no relationship to the grade, some of the poorer grades having a longer life then better grades.

The bills of lading issued by the carrier exempted it from liability for loss arising from "perils, dangers or accidents of the sea, * * * ferment, decay, liquefaction decomposition, sweat, * * * inherent defect, quality or vice of the goods." Under settled rules the carrier is not liable if the losses in question were due to any of these causes, provided the carrier used all reasonable measures in the stowage, care, and custody of the goods to prevent damage. The goods having been shipped in apparently good order and discharged in damaged order, however, the burden is on the carrier to prove that the damage came about through one or more of the excepted causes. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

In my opinion the proof brings these two cases within the excepted causes. The damage must have been due primarily to some defect inherent in the sugars. The striking feature of the Nagisan Maru case is that sugars of the marks "B E" and "I S C," in whatever hold, were damaged, while sugars of other marks stowed in the same holds and under like conditions were not damaged. So, too, as to the Shohei Maru; the B M sugar was found damaged, no matter what the hold, while sugars of other origin in the same spaces escaped. The damaged cargo on the two vessels showed the same symptoms—bags

on the bottom tier generally wet and badly stained, a few bags on the sides in like condition. There is a showing, too, of an epidemic of such cases in 1932, 1933, and 1934. The proof being that these sugars were stowed and cared for in the usual manner, the rational conclusion must be that when shipped the sugars were not in condition to withstand a voyage as long as that in prospect, either because they had been stored under unfavorable conditions or because they had been bagged warm. There is significance in the fact that some of the bags were wet and stained when tendered for shipment, and in the fact that when such bags were rejected the contents were put into dry bags and shipped. In neither of the two cases have we any prior history of the goods.

The fact that most of the staining was on the bottom bags does tend to show that a local condition in the lower part of the stowage spaces played a part in causing the damage. This, however, does not mean that stowage in the lower part was below standard; other sugars stored there were not affected. It means that conditions of ventilation, humidity, and sweat near the bottom of the holds were not as favorable as in the upper parts of the holds. With the Nagisan Maru the consignee receipted for the damaged bags as "sweat damaged." With the Shohei Maru the papers attached to the shipper's letter of claim mentioned the bags as being "sweat damaged." The humidity of holds is a peril of the sea. Clark v. Barnwell, 12 How. 272, 13 L.Ed. 985; Rich v. Lambert, 12 How. 347, 13 L.Ed. 1017.

The carrier has explained the damage sufficiently to bring it within exceptions in the bills of lading. There is nothing in either case on which a finding of negligence may be based. The theory of wet boards used as dunnage was advanced against the Nagisan Maru, and for this theory there is some testimony; but the weight of evidence is the other way. In case of the Shohei Maru we have only the faintest suggestion that something was amiss in the stowage. On the other hand, the testimony offered by the carrier warrants the finding that it had omitted no reasonable measures in the stowage, care, and custody of these cargoes.

While the precise causes of the damage do not appear, the record does show that the staining, decay, and liquefaction were due to a defect in the goods themselves, combined with a condition of dampness in the stowage spaces that was not abnormal in such a voyage, and that no negligence of the carrier contributed to the damage.

These cases are not like Jahn v. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L. Ed. 546, 15 Ann.Cas. 748, The Rosalia, 264 F. 285 (C.C.A.2), Stiles v. Ocean S. S. Co., 34 F.(2d) 627 (C.C.A.2), and The Joseph J. Hock, 70 F.(2d) 259 (C.C.A.2), where cargo was injured by the unexplained presence of sea water in the hold. Nor are these cases similar to The Africa Maru, 54 F.(2d) 265 (C.C.A.2), where there was no proof of inherent vice but where the evidence pointed to a wetting of the goods in transshipment. Schnell v. The Vallescura, supra, was an instance of decay caused in part by negligent ventilation. The cases here more closely resemble The Glenlochy, 226 F. 971 (D.C.Or.), The Lyra, 231 F. 250 (D.C.Cal.), and The Maine, 1927 A.M.C. 443.[1]

The libels will be dismissed.