## THE NAPLES MARU.

District Court, S. D. New York.
Aug. 30, 1937.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Eugene P. McCue, both of New York City, of counsel), for libelants.

Crawford & Sprague, of New York City (George C. Sprague and Roy W. Chamberlain, both of New York City, of counsel), for respondents.

MANDELBAUM, District Judge.

Two libels (consolidated) embrace causes of action for damage to a cargo of sugar transported from Iloilo, Hinigaran, Mombagid, and Manila, in the Philippine Islands, to Philadelphia and New York, aboard the steamship Naples Maru.

The libels allege the delivery of quantities of raw centrifugal sugar and refined sugar in good order and condition at the ports of shipment and the receipt thereof by the consignees at the ports of discharge in damaged condition.

The answers admit damage by sea water and/or sweat "due to perils of the sea" and the nature of the cargo. The bills of lading exceptions are pleaded as separate defenses, together with section 3 of the Harter Act (46 U.S.C.A. § 192).

The bills of lading, which refer to the freight engagements, embody the agreements between the parties. They contain certain exceptions and conditions which have a bearing on the issues at bar. They read as follows:

"(1) Contents, weight, measure, quality and value (except for freight purposes) unknown."

"(2) The act of God, perils of the sea * * * and all and every the dangers and accidents of the land and water, and of navigation of whatsoever nature and kind."

Stamped clauses:

"Ships not responsible for losses or damage by sweat caused through nature of cargo."

"Breakage of packs or bags and loss of contents at owner's risk."

The carriage of the sugar was made subject to the above exceptions and conditions.

The damage sustained by this sugar cargo was of three types: (1) Sea water damage; (2) sweat damage; and (3) molasses stains found on certain bags stowed in the lower holds, as well as throughout the stow.

As a complete bar to the actions, claimants-respondents contend that the proof adduced on the trial, as well as the depositions taken before trial, prove that damage designated above as types 1 and 2 falls within the bills of lading exceptions relieving the respondents of liability therefor in the absence or failure of proof on the part of the libelants of respondents' negligence. With regard to type 3 damage, it is contended that that too is within the exceptions contained in the bills of lading or is due to the inherent vice as to which it is protected by the common law and by the Harter Act (46 U.S.C.A. § 190 et seq.).

It may be said at the outset that actions of this character have frequently been adjudicated in this court, notably by Judge Robert P. Patterson in the Nagisan Maru and Shohei Maru Cases (D.C.) 14 F.Supp. 1010, and as recently as April 2, 1937, by Judge John C. Knox in The S. S. Glasgow Maru Case reported in 19 F.Supp. 530, 535, where in a very thorough and comprehensive opinion, he dismissed the libels.

While the court feels that some of the issues presented at bar are at variance with those in the aforementioned cases, yet they are of material assistance, and consequently the court leans heavily upon them.

Libelants state that "the basic law governing this case is well settled and no dispute is anticipated as to the applicable legal principles. The disputed questions are essentially of fact." Libelants' brief, p. 23.

With this statement, the court is fully in accord. The early case of Clark v. Barnwell, 12 How. 272, 13 L.Ed. 985, decided by the United States Supreme Court, as well as the more recent case of The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.

260

Ed. 373, are guideposts in applying the facts.

■ Mr. Justice Stone, in speaking for the court in The Vallescura, said, at pages 304, 305 of 293 U.S., 55 S.Ct. 194, 196, 79 L. Ed. 373: "It is commonly said that when the carrier succeeds in establishing that the injury is from an excepted cause, the burden is then on the shipper to show that that cause would not have produced the injury but for the carrier's negligence in failing to guard against it. Such we may assume the rule to be, at least to the extent of requiring the shipper to give evidence of negligence where the carrier has sustained the burden of showing that the immediate cause of the loss or injury is an excepted peril. Clark v. Barnwell, 12 How. 272, 280, 13 L.Ed. 985 [and cases cited]."

So that the issue resolves itself into whether or not the carrier succeeded in establishing that the damage to the sugar arose from excepted cause.

■ The respondents claim that the Naples Maru was seaworthy in every respect. That the weather and seas encountered during the voyage were of such unusual nature that the sea water damage was wholly attributable to "perils of the sea" and within the exceptions contained in the bills of lading. Let us for a moment confine ourselves to the physical aspects of the Naples Maru, as an aid in attempting to determine its seaworthiness. From the evidence, it appears that she underwent an annual inspection while in dry dock in Japan, prior to her departure for Manila; that she was inspected by Lloyd's representatives and received a 100—A1 classification (the highest in Lloyd's registry), and she was certified as fit to carry dry and perishable cargoes. Upon her arrival at Manila and prior to the acceptance of the cargo at Iloilo, her holds were cleaned. Again at Iloilo, her holds were surveyed by a marine surveyor representing Lloyd's agents and found it to be clean, dry, free from smell, and in every respect fit to receive cargo. The captain examined the vessel and found her to be seaworthy and fully manned, equipped, and supplied.

The first claim of unseaworthiness is attributed to the alleged overloading of the Naples Maru, so as to have prevented her from properly withstanding the rough seas encountered. Both sides have submitted mathematical calculations regarding the drafts of the ship in support of their respective contentions that the vessel was or was not overloaded. After carefully considering all factors entering into the situation and allowing for the fact that at the time of loading the vessel was in fresh water in Iloilo river and hence deeper by several inches than when immersed in more buoyant waters and would rise accordingly when entering salt water, as well as the consumption of coal, fresh water, and stores used daily, it is the court's finding that the vessel was not overloaded. Even if she was slightly over her mark, no causal connection has been shown between this and the damage to the cargo. Overloading must be the proximate cause of the damage to the sugar before the respondents may be charged with liability on that score. See Francis Wright, 105 U.S. 381, 387, 26 L.Ed. 1100; The Turret Crown (C.C.A.) 284 F. 439, 444.

It is strenuously urged by the libelants that the weather and seas encountered were ordinary in character, and the respondents cannot therefore avail themselves of the "perils of the sea" exceptions in the bills of lading. In support of the argument, they submit numerous authorities which have dealt with this question, together with evidence of alleged tampering with the rough logbooks of the vessel. These fabrications, they say, were made to coincide with the respondents' contentions regarding the phenomenal nature of the weather and seas. For example, they attempt to show insertions of such words as "strong" (breeze), "rough" (sea), and the word "much." Also, "moderate gale" and the word "violently," as being substituted over an erasure of a prior entry.

The libelants make the point that, by reason of these alleged fabrications, the court should be dubious of everything else offered by the respondents in support of their side of the controversy.

The court cannot agree with the libelants on this issue. For, while there may have been some tampering with the rough logbooks, in the opinion of the court, it would be unjustified in making this one fact (even if completely true), arbitrarily, the determinative factor in this case.

■ In The Rosalia (C.C.A.) 264 F. 285, 288, Judge Hough said that a peril of the sea "which forms a good exception in a bill of lading means something so catastrophic

as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety."

A more recent interpretation of this definition was expressed by the Circuit Court of Appeals of this court in the case of Duche v. Thomas & John Brockelbank, 40 F.(2d) 418. The court, in approving the definition laid down in The Rosalia, supra, said at page 419 of 40 F.(2d): "One's conception of what is catastrophic may differ from that of another, *but the words 'so catastrophic' could, of course, be replaced by colorless words like 'of such a character' without changing the legal import at all.*" (Italics by the court.)

■ The testimony and exhibits show to the satisfaction of the court that the Naples Maru commenced to experience bad weather on October 25, 1933, at 10 p. m., at which time all hatches and ventilators were closed and battened down; that heavy weather continued thereafter for 7 days, with a whole gale (force 10 on Beaufort scale, velocity 65 miles per hour) blowing continuously for 33 hours at a stretch and with a propeller slip of 66 per cent. at noon on November 29th, for the previous 24 hours during which day the distance run was only 80 miles; of 80 per cent. at noon on November 30th, during which day the distance run was only 40 miles; and of 72 per cent. at noon on December 1st, when the distance run was only 63 miles. The vessel was under way 33 days, 8½ hours in traversing the 6,624 nautical miles between Manila and San Pedro, which is an average speed of 8.27 nautical miles per hour. The respondents compute the loss of 4 days, 7½ hours on the trip. In all, the voyage consumed 59 days after sailing from Manila and 76 days after she loaded her first cargo. This was undoubtedly an extremely long voyage.

After the ship arrived at New York, the officers and crew, in their depositions, described the intensity of the storm. Of course, the alleged tampering with the logbooks makes the court hesitate in accepting at face value everything they said. However, a corroborative element sways the court to hold that the weather and seas encountered are within the definition of "perils of the sea" as laid down in The Rosalia, supra, and Duche v. Thomas & John Brockelbank, supra.

■ During the voyage, some structural damage was suffered by the vessel. The officers testified that the port lifeboat was crushed by a wave coming over the bridge; that the steel casing of the saloon just aft of No. 2 hatch was set in 2 inches; that steel casing of engineers' room was set in 2 inches or more; that the lower bridge bulwark and iron stanchion were carried away; that the stokehold ventilator was crushed, the angle bar fractured at starboard force corner of No. 2 hatch; the starboard after corner of No. 3 hatch and both port and starboard after corner of No. 4 hatch.

It is the court's determination therefore (in the language of The Warren Adams [C.C.A.] 74 F. 413, 415) that the sea water damage experienced by the Naples Maru was a marine casualty "resulting from the violent action of the elements, as distinguished from their natural, silent influence, upon the fabric of the vessel."

■ With respect to the criticism levelled at the tarpaulins used, the court has carefully considered the testimony on that score and finds that they were serviceable and in good condition when the vessel sailed. The court finds that they (the tarpaulins) were waterproofed before being sold to the respondents and tested by the latter upon their receipt. The top tarpaulins on Nos. 1 and 2 hatches were torn in the storm. The hatch wedges were loosened at Nos. 1 and 2 hatches during the storm, allowing the water to be sucked into the hatches around the coamings wetting the tarpaulins, boards, and the cargo underneath. The court rejects the suggestion by the libelants that the tarpaulins were torn and defective, thereby permitting the water to go through them. The libelants' charge of unseaworthiness by reason of obstructed scuppers is not sustained. The evidence shows that the cargo holds were carefully cleaned before the cargo was loaded. It is further found that the eventual clogging of the scuppers after they had carried off most of the syrupy water in No. 2 upper 'tween deck did not cause damage to the sugar in any way. In any event, it was the sea water that came in and which constituted a peril of the sea which was the proximate cause of the damage and not the scuppers.

■ It is claimed by the respondents that the damage to the sugar caused by sweat (type 2) also comes within the exceptions of the bills of lading, and the respondents **are relieved of any liability therefor.**

The evidence convinces the court that the sweat damage (condensation of moisture) was caused by the same peril of the sea which prevented all ventilation by hatches and ventilators from November 25, 1933, at 10 p. m. until December 6th, when they were opened for 24 hours after which the weather again required their closing until December 13th.

Moisture and sweat in a ship's hold when same could not be opened is a peril of the sea which relieves the carrier from liability. Clark v. Barnwell, supra.

■ At bar, the condition of the weather was sufficient excuse for the failure to ventilate (except for a period of 18 days when the ventilators and hatches were opened). It is not for the court to say when it was safe to open the hatches and ventilators. This is solely in the discretion of the master. This court can only reverse his judgment where there appears to be a clear abuse of discretion on his part. Nothing of this character is evident in this case. See The La Drome (D.C.) 43 F.(2d) 241, 242; The Tergestea (D.C.) 54 F.(2d) 809, 810, 811.

■ The libelants strongly condemn the permanent ventilating system of the Naples Maru because of the use by it of split mushroom ventilators. Impressive drawings and technical discussions are submitted to sustain this point. It seems that the split mushroom ventilators acted as outlets for the air while the cowl ventilators served as inlets. While it may be argued that a more effective ventilating system could have been employed on the Naples Maru, it nevertheless appears to the court that the facilities afforded were sufficient to provide proper ventilation for a cargo of this character. Though not of any probative value, it is fair to observe that similar ventilating systems have been in constant use in transporting perishable cargo over the Pacific. In fact, split mushroom ventilation, like those on the Naples Maru, have been used by the Grace, Cosulich, and Italina Lines, as well as on Danish and Shipping Board Ships. Trial minutes, p. 520.

The accusations pointed at the officers of the Naples Maru, with respect to tampering with the rough log entries regarding ventilation, while sustained in some respects, does not impel the court to disregard them entirely as a complete fabrication.

■ Finally, regarding the damage due to molasses stains on the bottom of the bags in the lower tiers of the lower holds, and to the molasses stained bags in the interior of the stow (where the other bags were otherwise sound (type 3). The respondents attribute this condition to the excessive moisture of the raw sugar when shipped and disclaim responsibility by reason of the exceptions contained in the bills of lading, or is due to an inherent vice as to which it is protected by the common law and section 3 of the Harter Act (46 U.S.C.A. § 192).

Section 3 says in substance that carriers shall not be liable for the inherent defect, quality or vice of a thing carried.

There was some testimony to the effect that at the time of loading the ship the officers declined certain bags of sugar that were externally wet and that the shippers tendered other bags in their place which were externally dry. No proof was adduced as to where these substituted bags came from. It is possible that the contents of the wet bags that were declined had been poured into sound bags and retendered. This inference is strengthened by the fact that the shippers had no extra bags of sugar on hand beyond the 64,000 contracted to be loaded on board the Naples Maru. The proof is clear that these bags of sugar were stowed and cared for in the usual manner. Nothing that was done by the carrier can be said to have caused the damage. The irresistible conclusion is that section 3 of the Harter Act, as well as the common law, protects the carrier and the loss must be borne by the shipper. Clark v. Barnwell, supra; The Nagisan Maru and Shohei Maru, supra.

■ But one other point need be passed upon. Libelants contend that the admission in the bills of lading that the cargo was received on board the Naples Maru in apparent good order and condition shifts the burden to the respondents to go forward with the proof that it is otherwse. I cannot agree with this theory. There is nothing in the record which shows the actual condition of the cargo when it was taken aboard the vessel. In this connection, the language of Judge Knox in the Glasgow Maru Case, above mentioned, fits this situation so completely that the court will quote from the opinion: "No assumption that the sugar was properly treated and protected prior to shipment can be indulged. If the sugar was damp at the time of shipment, the moisture was sure to

manifest itself in the vessel's hold, and that manifestation, according to the experts, would be shown in the wings of the ship, and upon the lower tiers of the stow. Before a decree of improper care upon the part of the ship can go against respondent, the court must be able to find that the sugar, at the time of shipment, was itself free of vice. In this case, that cannot be said. * * * It is difficult for me to see how this vessel, under all circumstances, could exercise care sufficient to avoid considerable sweating in the holds. Indeed, I think the facts here are such as to bring the case within Clark v. Barnwell, 12 How. (53 U.S.) 272, 13 L.Ed. 985."

It is therefore the conclusion of the court that the damage sustained to the cargo was due to excepted causes and that the libelants have failed to prove the respondents' negligence in guarding against it.

The libels are accordingly dismissed.