## THE "FRANCIS WRIGHT."

1. The act of Feb. 16, 1875, c. 77, whereby the appellate jurisdiction of this court in admiralty causes is limited to the determination of questions of law arising on the record is constitutional.
2. Where the court below, when thereunto requested, refuses to give any finding upon an ultimate disputed fact, established by competent evidence and which is involved in the cause, and material to its determination, or where, against remonstrance, it finds such a fact, in the absence of all evidence, the ruling, if excepted to at the time, and incorporated in a bill of exceptions which states the alleged error and the ground relied on below to sustain the objection presented, may, as a question of law, be reviewed here.
3. The court condemns the practice of drawing up bills of exception, which, so far from being "prepared as in actions at law," are framed as, if possible, to secure here a re-examination of the facts.
4. The court, upon the facts found, affirms the decree below.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

Duncan & Poey, the libellants, entered into the following charter-party with Woodhouse & Rudd, the claimants: —

"This charter-party, made in the city of New York this thirteenth day of September, in the year one thousand eight hundred and seventy-two, between Messrs. Woodhouse & Rudd, owners of the steamer 'Francis Wright,' of New York, of the burthen of 600 tons or thereabouts, now lying in the harbor of New York, of the first part, and Messrs. Duncan & Poey, merchants of Philadelphia, of the second part, witnesseth:

"That the said party of the first part, in consideration of the covenants and agreements hereinafter mentioned, to be kept and performed by the said party of the second part, does covenant and agree on the freighting and chartering of the said vessel to the said party of the second part for the term of six months, to run between Philadelphia or New York and Galveston, or any intermediate safe port in the United States, or any foreign port not prohibited by the insurance.

"It is further understood and agreed, that the said parties of the second part are to have the privilege of cancelling this charter at the expiration of three months, upon giving the parties of the first part fifteen days' notice, and the payment of fifteen hundred dollars bonus on the terms following, viz.:

"*First*, The said party of the first part agrees the said vessel, in and during the said voyage, shall be kept tight, stanch, well fitted, tackled, and provided with every requisite for such a voyage.

"*Second*, The said party of the first part further agrees the whole of the said vessel (with the exception of the necessary room for the sails, cables) shall be at the sole use and disposal of the said party of the second part during the voyage aforesaid.

"*Third*, The said party of the first part further agrees to take and receive on board the said vessel, during the aforesaid voyage, all such lawful goods and merchandise as the said party of the second part, or their agents, may think proper to ship.

"And the said party of the second part, in consideration of the covenants and agreements to be kept and performed by the said party of the first part, do covenant and agree with the said party of the first part to charter and hire the said vessel, as aforesaid, on the terms following, viz.: To man, coal, and victual steamer, and pay all expenses of every nature (including port charges, &c.) connected with running of the steamer, except insurance on vessel and repairs, and to pay to the said party of the first part, or their agent, for the charter or freight of said vessel, during the voyage aforesaid, in manner following, viz.: Eighty-five ($85) dollars per day, United States currency, due daily, but payable at the expiration of each and every month, in New York; vessel to be returned to the owners at the expiration of this charter, in the same order and condition as she is now in, less the ordinary wear and tear. Charterer to take and deliver the steamer at New York; owners to nominate and charterers to appoint chief engineer, to be paid by charterers at rate of one hundred and twenty-five ($125) dollars per month. Charterers to appoint captain subject to the approval of the owners. It is also agreed that this charter shall commence at New York on the 18th of September, 1872.

"If from any derangement of machinery steamer is delayed, the time lost is not to be paid for by charterers, and in case such derangement, if any, owners to have privilege of cancelling charter. In case of any wreckage, towage, or salvage, accruing to the vessel whilst under this charter, one-half of said earning to be paid to the owners of the steamer. To the true and faithful performance of all the foregoing covenants and agreements the said parties do hereby bind themselves, their heirs, executors, administrators, and assigns, and also the said vessel, her freight and appurtenances, and the merchandise to be laden on board, each to the other in the penal sum of estimated amount of this charter.

·"In witness whereof the said parties have hereunto interchange-
ably set their hands and seals the day and year first above written.

"WOODHOUSE & RUDD.

, "DUNCAN & POEY.

"Sealed and delivered in presence of

"W. H. STARBUCK, witness to both signatures."

The libel filed in the District Court alleges that, in accord-
ance with the terms of the charter-party, Sherman was ap-
pointed chief engineer of the steamer, and Denison her captain;
that the libellants took her to Philadelphia, where they fitted
her with refrigerators and other appliances for bringing a
cargo of fresh beef from Galveston to Philadelphia, and then
despatched her to Galveston; that on the outward voyage the
vessel gave signs of unseaworthiness in the blowing and leak-
ing of some of her boiler-tubes, by which the time of the
voyage was fourteen instead of ten days, the usual time; that
at Galveston the chief engineer was notified by the libellants
to make repairs, &c., but he refused, whereby she, having taken
a cargo of about seventy tons of fresh beef, was, Oct. 31, 1872,
being then four hours at sea, out of the port of Galveston, com-
pelled to put back there for repairs by reason of the boiler-
tubes again blowing out and leaking, and was detained at
Galveston seven days for repairs, leaving there again Nov. 7,
1872, and was fifteen days making the passage to Philadelphia,
owing to the unseaworthy and defective condition of the boiler;
and that by reason of these detentions and of the unseaworthy
condition of the boiler, and also of the hot water which escaped
from the boiler-tubes and was negligently allowed to run into
the steamer's bilge and melt the ice in the refrigerators where
the fresh beef was stowed, the beef became spoiled and entirely
lost, to the damage of libellants $30,000, which they claim to
recover.

The steamer was attached, but was subsequently released,
upon the claimants entering into the usual stipulations con-
formably to the rules and practice of that court. The claim-
ants answered, admitting the making of the charter-party, the
appointment of the chief engineer and captain, and the libel-
lants' taking possession of the steamer. They deny all the
other material allegations of the libel, and aver that she as far

as they were bound to do, was kept as required by the contract.

The District Court dismissed the libel, and the Circuit Court entered a decree of affirmance. The libellants excepted to certain of the findings of fact and to the refusal to find certain facts by them requested and to the conclusions of law. They thereupon appealed here. The bill of exceptions is incorporated in the record.

The remaining facts appear in the opinion of the court.

Mr. *Robert D. Benedict* and Mr. *Benjamin Harris Brewster* for the appellants.

Mr. *William Allen Butler*, contra.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Three questions have been presented on the argument of this appeal:—

1. Whether Congress has the constitutional power to confine the jurisdiction of this court on appeals in admiralty to questions of law arising on the record;

2. Whether, upon the bill of exceptions, the court below erred in refusing to find certain facts which, as is claimed, were established by uncontradicted evidence, and in finding others which had no evidence at all to support them; and,

3. Whether, on the facts found, the decree below was right.

1. As to the jurisdiction.

If we understand correctly the position of the counsel for the appellants, it is precisely the same as that which occupied the attention of the court in *Wiscart* v. *Dauchy*, decided at February Term, 1796, 3 Dall. 321. There the question was, what, under the Judiciary Act of 1789, could be considered on a writ of error bringing to this court for review a decree in admiralty. The decision turned on the construction to be given the twenty-second section of the act, and Mr. Justice Wilson, in his minority opinion, said : " Such an appeal," that is to say, an appeal in which all the testimony is produced in this court, " is expressly sanctioned by the Constitution ; it may, therefore, clearly, in the first view of the subject, be considered as the most regular process ; and as there are not any words in the

judicial act restricting the power of proceeding by appeal, it must be regarded as still permitted and approved. Even, indeed, if positive restriction existed by law, it would, in my judgment, be superseded by the superior authority of the constitutional provision." Mr. Chief Justice Ellsworth, however, who spoke for the majority of the court, said: "If Congress has provided no rule to regulate our proceedings, we cannot exercise an appellate jurisdiction; and if the rule is provided, we cannot depart from it. The question, therefore, on the constitutional point of appellate jurisdiction, is simply whether Congress has established a rule for regulating its exercise." And, further on: "It is observed that a writ of error is a process more limited in its effects than an appeal; but whatever may be the operation, if an appellate jurisdiction can only be exercised by this court conformably to such regulations as are made by the Congress, and if Congress has prescribed a writ of error, and no other mode, by which it is to be exercised, still, I say, we are bound to pursue that mode, and can neither make, nor adopt, another." And again: "But surely it cannot be deemed a denial of justice that a man shall not be permitted to try his cause two or three times over. If he has one opportunity for the trial of all the parts of his case, justice is satisfied; and even if the decision of the Circuit Court has been made final, no denial of justice can be imputed to our government; much less can the imputation be fairly made, because the law directs that, in case of appeal, part shall be decided by one tribunal and part by another, — the facts by the court below, and the law by this court. Such a distribution of jurisdiction has long been established in England."

This was the beginning of the rule, which has always been acted on since, that while the appellate power of this court under the Constitution extends to all cases within the judicial power of the United States, actual jurisdiction under the power is confined within such limits as Congress sees fit to prescribe. As was said by Mr. Chief Justice Marshall in *Durousseau* v. *United States* (6 Cranch, 307, 314), "The appellate powers of this court are not given by the judicial act. They are given by the Constitution. But they are limited and regulated by the judicial act, and by such other acts as have been passed on

the subject." The language of the Constitution is that "the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as Congress shall make." Undoubtedly, if Congress should give an appeal in admiralty causes, and say no more, the facts, as well as the law, would be subjected to review and retrial; but the power to except from — take out of — the jurisdiction, both as to law and fact, clearly implies a power to limit the effect of an appeal to a review of the law as applicable to facts finally determined below. Appellate jurisdiction is invoked as well through the instrumentality of writs of error as of appeals. Whether the one form of proceeding is to be used or another depends ordinarily on the character of the suit below; but the one as well as the other brings into action the appellate powers of the court whose jurisdiction is reached by what is done. What those powers shall be, and to what extent they shall be exercised, are, and always have been, proper subjects of legislative control. Authority to limit the jurisdiction necessarily carries with it authority to limit the use of the jurisdiction. Not only may whole classes of cases be kept out of the jurisdiction altogether, but particular classes of questions may be subjected to re-examination and review, while others are not. To our minds it is no more unconstitutional to provide that issues of fact shall not be retried in any case, than that neither issues of law nor fact shall be retried in cases where the value of the matter in dispute is less than $5,000. The general power to regulate implies power to regulate in all things. The whole of a civil law appeal may be given, or a part. The constitutional requirements are all satisfied if one opportunity is had for the trial of all parts of a case. Everything beyond that is matter of legislative discretion, not of constitutional right. The Constitution prohibits a retrial of the facts in suits at common law where one trial has been had by a jury (Amendment, art. 7); but in suits in equity or in admiralty Congress is left free to make such exceptions and regulations in respect to retrials as on the whole may seem best.

We conclude, therefore, that the act of Feb. 16, 1875, c. 77, is constitutional, and that under the rule laid down in *The*

*Abbotsford* (98 U. S. 440), and uniformly followed since, our inquiries are confined to questions of law arising on the record, and to such rulings, excepted to at the time, as may be presented by a bill of exceptions prepared as in actions at law.

2.  As to the questions arising on the bill of exceptions.

It is undoubtedly true that if the Circuit Court neglects or refuses, on request, to make a finding one way or the other on a question of fact material to the determination of the cause, when evidence has been adduced on the subject, an exception to such refusal taken in time and properly presented by a bill of exceptions may be considered here on appeal. So, too, if the court, against remonstrance, finds a material fact which is not supported by any evidence whatever, an exception is taken, a bill of exceptions may be used to bring up for review the ruling in that particular. In the one case the refusal to find would be equivalent to a ruling that the fact was immaterial; and in the other, that there was some evidence to prove what is found when in truth there was none. Both these are questions of law, and proper subjects for review in an appellate court. But this rule does not apply to mere incidental facts, which only amount to evidence bearing upon the ultimate facts of the case. Questions depending on the weight of evidence are, under the law as it now stands, to be conclusively settled below and the fact in respect to which such an exception may be taken must be one of the material and ultimate facts on which the correct determination of the cause depends.

In the present case the ultimate fact to be determined was whether the loss for which the suit was brought happened because of the insufficient refrigerating apparatus, or the unseaworthiness of the vessel. It is found in express terms that the loss was "caused by the defective construction and working of the refrigerating room and apparatus connected therewith, either from inherent defects in said apparatus, or from not using a sufficient quantity of ice, and not by any fault of the claimants." As to this both the Circuit and District Courts agree. This fact being established, it was unimportant to inquire whether the vessel was seaworthy or not. If the unseaworthiness was not the proximate cause of the loss, it is not contended the vessel can be charged with the damages.

But if it be conceded that the case depended on the seaworthiness of the vessel, we think the exceptions which have been taken cannot be considered here. The only unseaworthiness alleged was in respect to the boiler, and as to this the court has found that the boiler was a tubular one; that tubular boilers are liable to leakage in the tubes; that such leakage does not necessarily interfere with the capacity or fitness of the boiler for the purposes of navigation; that this particular boiler had one hundred and forty-four tubes; that some of these tubes gave out from time to time and were plugged up; that when the vessel arrived at Philadelphia at the end of her voyage, twenty-six of the tubes had been plugged up, but that the boiler was still efficient and seaworthy. It was also found that the voyage from Galveston to Philadelphia was two days longer than was usually occupied by well-equipped steamers, and that the vessel put back for repairs, by which an additional week's time was lost at Galveston.

The complaint now made is, that the court refused to state in its findings that there was leakage in the tubes and stoppage for repairs while the vessel was on her voyage from Philadelphia to Galveston, and while she was lying in the harbor at Galveston taking in her cargo, and that when the vessel put back to Galveston the engineer had not sufficient tools with which to make his repairs. All these are mere incidental facts, proper for the consideration of the court in determining whether the boiler and the vessel were actually seaworthy or not. It is not pretended that the question at issue was to be determined alone by the probative effect of these circumstances. They were part only of the evidence on which the ultimate finding depended, and occupy in the case the position of testimony rather than of the facts to which the law is to be applied by the judgment of the court. The refusal of the court to put such statements into the record, even though established by uncontradicted evidence, cannot properly be brought here by a bill of exceptions, unless it also appears that the determination of the ultimate fact to be ascertained depended alone upon the legal effect as evidence of the facts stated. Such, clearly, is not this case.

There is another equally fatal objection to this bill of exceptions. An evident effort has been made here, as it has been before, to so frame the exceptions as, if possible, to secure a re-examination of the facts in this court. The transcript which has been sent up contains the pleadings and all the testimony used on the trial below. The bill of exceptions sets forth that at the trial the pleadings were read by the respective parties, and the testimony then put in on both sides. This being done, the libellants presented to the court certain requests for findings of fact and of law. These requests were numbered consecutively, sixteen relating to facts and three to the law. Afterwards, six additional requests for findings of fact were presented. It is then stated that the court made its findings of fact and of law and filed them with the clerk, together with an opinion in writing of the circuit justice who heard the cause. The libellants then filed what are termed exceptions to the findings and the refusals to find. In this way exceptions were taken separately to each and every one of the facts found and the conclusions of law, and to the refusal to find in accordance with each and every one of the requests made. The grounds of the exceptions are not stated. Many of the requests of the libellants are covered explicitly by the findings as actually made, some being granted and others refused

We have no hesitation in saying that this is not a proper way of preparing a bill of exceptions to present to this court for review rulings of the Circuit Court such as are now complained of. A bill of exceptions must be " prepared as in actions at law," where it is used, "not to draw the whole matter into examination again," but only separate and distinct points, and those of law. Bac. Abr., Bill of Exceptions ; 1 Saund. Pl. & Ev. 846. Every bill of exceptions must state and point out distinctly the errors of which complaint is made. It ought also to show the grounds relied on to sustain the objection presented, so that it may appear the court below was properly informed as to the point to be decided. It is needless to say that this bill of exceptions meets none of these requirements. From anything which is here presented no judge would be presumed to understand that the specific objection made to any one of his findings was that no evidence what-

ever had been introduced to prove it, or to one of his refusals, that the fact refused was material and had been conclusively shown by uncontradicted testimony. No ground whatever is stated for any one of all the exceptions that have been taken. To entitle the appellants to be heard here upon any such objections as they now make to the findings, they should have stated to the court that they considered the facts refused material to the determination of the cause, and that such facts were conclusively proven by uncontradicted evidence. Under such circumstances it might have been permissible to except to the refusal and present the exception by a bill of exceptions, which should contain so much of the testimony as was necessary to show that the fact as claimed had been conclusively proven. And so if the exception is as to facts that are found, it should be stated that it was because there was no evidence to support them, and then so much of the testimony as was necessary to establish this ground of complaint, which might under some circumstances include the whole, should be incorporated into the bill of exceptions. In this way the court below would be fairly advised of the nature of the complaint that was made in time to correct its error, if satisfied one had been committed, or to put into the bill of exceptions all it considered material for the support of the rulings.

From this it is apparent we cannot on this appeal consider any of the rulings below which have been presented by the bill of exceptions.

3. As to the sufficiency of the facts found to support the decree.

Upon this branch of the case we have had no more difficulty than upon the others. The case made may be generally stated as follows : —

The libellants, being about to engage in the business of transporting fresh beef by the use of a newly patented process, applied to the claimants for a charter of their steamer for six months, to be put into that trade. The claimants knew for what business the vessel was engaged, and the libellants knew that she was furnished with a tubular boiler. Such boilers are liable to leak, but that does not necessarily interfere

with their capacity or fitness for the purposes of navigation. The charter-party contained this clause; —

"First, The said party of the first part agrees the said vessel, in and during the said voyage, shall be kept tight, stanch, well fitted, tackled, and provided with every requisite for such a voyage."

The charter-party makes no mention of the special business in which the vessel was to be engaged. She was chartered generally for six months to run between Philadelphia and New York and Galveston, or any intermediate safe port in the United States, or any foreign port not prohibited by the insurance. The only complaint made as to her seaworthiness, is in respect to her boiler, and about this it is found that though to some extent leaking, as boilers of that class are liable to be, it was still efficient and seaworthy. The libellants fitted the vessel with the necessary apparatus for the use of their patented process, and with a full knowledge that her boiler was apt to leak, put a cargo of fresh beef on board to be taken from Galveston to Philadelphia. The vessel was twenty-three days in making that voyage instead of fourteen, which was the usual time of well-equipped steamers. The beef was spoiled before it got to Philadelphia, but it is expressly found that this was because of the defective construction and working of the refrigerating room, and the apparatus and machinery connected therewith, for which the claimants were in no respect responsible.

Upon these facts the court below dismissed the libel, which we think was clearly right. That the vessel was in fact seaworthy is settled by the findings. All the claimants covenanted for was, that she was provided with every requisite for safe navigation. While they knew that her charterers intended to use her in connection with their contemplated business, it is neither found nor insisted that any higher degree of seaworthiness was required for that kind of transportation than any other, much less that the claimants knew it. Under these circumstances the language of the charter-party is to be construed only as an agreement that the vessel was seaworthy for the purpose of navigating such a voyage as she was chartered to make, without any regard to what she was to carry.

The claimants did not contract that their vessel was in a condition to make her voyages in any particular time, but only to make them safely. They were not applied to for a vessel suitable for carrying fresh beef, but for one suitable for navigation generally between the designated ports and places. Such a vessel according to the findings they got. It was their fault alone if they did not apply for what they wanted. They took all the risks of the undertaking, except such as arose from the general unseaworthiness of the vessel when she was delivered into their possession, for after they got her she was to be subject to their entire control within the terms of the charter. If repairs were necessary to keep her in a seaworthy condition, while under the charter the claimants might be chargeable with the expense of making them, it would be the duty of the charterers to see that they were made, or to notify the claimants of what was required. The provision that the claimants were to nominate and the charterers appoint the engineer, and that the appointment of the captain by the charterers should be subject to the approval of the claimants, did not affect the relation of the parties in this particular. Delays growing out of derangement in the machinery were to be deducted from the charter time, and the pay for the use of the vessel correspondingly reduced, but beyond that the owners were not to be bound if the vessel was actually seaworthy when delivered into the possession of the charterers under the charter.

*Affirmed.*