### J. LICHTMAN & SONS v. DOLLAR STEAMSHIP LINE et al.

No. 10748.

District Court, E. D. New York.

Feb. 7, 1936.

Single & Tyler, of New York City (Alonzo L. Tyler and Wilbur H. Hecht, both of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. De Grove Potter and William M. Rodewald, both of New York City, of counsel), for respondent.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and James McKown, Jr., both of New York City, of counsel), for impleaded respondent.

GALSTON, District Judge.

The libel was filed November 25, 1927, and on October 17, 1928, an amended libel was filed, but the case was not brought on for trial until December 20, 1935. It is alleged that on or about May 5, 1927, the Hamburg American Line issued and delivered to Melchers & Co., at Hankow, China, a bill of lading which recited that 87 bales of hides had been shipped by Melchers & Co. on board the steamship Idarwald in apparent good order and condition, to be delivered at Shanghai to the order of the Dollar Steamship Line. On the same day Melchers & Co. delivered the Hamburg American Line bill of lading to the Dollar Steamship Line at Hankow. Thereupon the Dollar Steamship Line issued its bill of lading to Melchers & Co., bearing the same date, May 5, 1927, at Hankow, covering the same shipment, and reciting that the 87 bales of hides were shipped on board the steamship Idarwald in apparent good order and condition, to be carried to Shang-

hai, China, and there to be transshipped to the steamship President Harrison and by her to be delivered in like condition at New York.

Thereafter the libelant became the owner and holder in due course of the Dollar Steamship Line bill of lading and in reliance upon its terms became the owner of the merchandise in question. It is alleged that on the arrival of the steamship President Harrison in New York on July 14, 1927, the bales of hides were discharged and tendered to the libelant, but were not in good order and condition, nor in apparent good order and condition, but, on the contrary, were damaged externally and internally in violation of the obligations of the carrier and of the terms of the bill of lading. It is alleged that the damage to the 87 bales of hides occurred prior to the arrival of the goods at the port of Shanghai and prior to the delivery of the goods to the Dollar Steamship Line at Shanghai, but without the knowledge of the libelant at the time of the acceptance of the draft in payment of the shipment.

The Dollar Steamship Line admits that the damage or injury complained of occurred prior to the arrival of the goods at the port of Shanghai and prior to the delivery of the goods to the Dollar Steamship Line at Shanghai, but alleges that the 87 bales of hides were not in good condition when delivered to the Dollar Steamship Line and the President Harrison at Shanghai, and that the damage was not due to any negligence on the part of the respondent, but was due to causes from which the carrier is exempted by its contract including inherent vice.

The Dollar Steamship Line impleaded the Hamburg Amerikanische Packetfahrt Aktien-Gesellschaft, and the answers to the amended libel and to the petition, by the impleaded respondent, allege that, if any damage was sustained by the goods, the damage fell within one or more of the exceptions noted in the bill of lading of the Hamburg-American Line, and that the bales of hides were never in the custody of the respondent impleaded. In the answer to the petition, the respondent impleaded alleges that the 87 bales of cowhides referred to in the amended libel were in fact shipped from Hankow, China, to Shanghai, China, on the steamship Loongwo, which was not owned or operated or controlled by, the Hamburg-American Line, and were never in the possession of the Hamburg-American Line.

At the trial the libelant admitted that it had no claim against the Hamburg-American Line.

The respondent filed exceptions to the amended libel, two of which, relating to the allegations of the eleventh and fourteenth paragraphs of the amended libel, were sustained on March 12, 1929, by Judge Moscowitz, "without prejudice to an application to the court for leave to re-allege them by way of libel after respondent has filed its answer." [1] These allegations are that on May 14, 1927, Melchers & Co. issued to the Dollar Steamship Line at Hankow a letter of indemnity with respect to the shipment of 87 bales of hides, wherein it was stated by Melchers: "We are willing to hold you blameless for all consequences which may arise from your signing shipped Ocean Bs/Lading against presentation of a river B/Lading issued by the Hapag (s/s 'Idarwald'), whilst the cargo has actually gone forward on s/s 'Loongwo.' "

The proof shows that the bales of hides making up the shipment in question had been in the go-down of Melchers & Co. at Hankow prior to delivery to the Loongwo. Libelant's answers to interrogatories show that it does not know where the bales had been collected, cured, or stored, nor how they were shipped to Hankow, nor when. Nor is there any proof offered by the libelant as to whether any curing or preservative treatment had been given to the hides. The bill of lading obtained by Melchers & Co. on May 5, 1927, a copy of which is annexed to the amended libel, shows that it was executed by somebody representing himself as an agent of Carlowitz & Co., and recited that the hides had been shipped on board the steamship Idarwald. This bill of lading was taken by Melchers & Co. to Kay, the Hankow manager of the Dollar Line. Kay then issued to Melchers, who had previously engaged space on the President Harrison, a Dollar Line bill of lading. This bill of lading was later presented to the Equitable Trust Company, accompanied by a draft drawn by Melchers & Co. under a letter of credit on June 11, 1927.

Actually the shipment of cowhides left Hankow on the night of May 11, 1927, on

---

[1] No such application was made before trial.

the steamship Loongwo, and was due to leave Shanghai at noon on May 14, 1927. Upon arrival at Shanghai, the cowhides were stored in a warehouse of Jardine Matheson & Co., Limited, and delivered to the Dollar Steamship on May 18 or May 19, 1927. The cowhides were loaded on the steamship President Harrison, which sailed from Shanghai on May 20, 1927.

The libelant offered in evidence depositions taken by the respondents. Decision was reserved on the admissibility of some of the evidence. In answer to a cross-interrogatory, Kay stated that he had learned from the harbor master's office that there had been thirteen hours of hard rain on May 11, 1927, when the hides were loaded on the Loongwo. This is clearly hearsay and is not admissible. In the answer to the same interrogatory, he stated that he had inquired of Jardine Matheson & Co., Limited, whether any exceptions had been noted on the mate's receipt, and was informed that a notation had been made thereon by the chief officer, reading: "All wet by rain." This also is hearsay and cannot be admitted. The mate's receipt should have been produced. The libelant had ample opportunity for taking depositions of competent witnesses.

Apparently the only witness who testified as to having seen these bales at the time of delivery was Burgess, chief officer on the President Harrison. He said that the hides were stowed with other cargo on top of boxes. Dunnage was placed between the boxes and the hides. Nothing was stowed above the hides. On the after side of the hides, antimony and rubber were stowed, and forward of the hides Chinese groceries in cases. There was no wet cargo nor were there any barrels containing liquid in the compartment. No complaint can be made of the stowage or ventilation. This witness testified that all hides, before taken on board, had always had his personal examination. He said no rain could have come in contact with the hides while they were in the vessel. Apparently they were in good condition when they were received on board. Burgess said the hides did not appear to be mildewed, and were dry on the outside.

When the bales were delivered in New York, the Dollar Line delivery book was signed without any exception being taken. On the arrival of some of these bales at the libelant's premises, a few were opened and processed. Damage was found, and a notification thereof given to the Dollar Line.

The experts differ as to the cause of the damage which was found. Kemp, a witness for the libelant at the trial, testified that he found the bales were compressed, held by five burlap-covered iron bands running crosswise of the bale. On the flat of each bale was an identification mark. These bales showed external mould and mildew to a varying serious degree, but no evidence of actual water contact. On opening two typical bales and examining the contents, hide by hide, evidence of excess dampness and of heating was found to be present. The heating was most apparent in the center of the bales and mould and mildew confined to the portions nearer the surface. Development of the heating was further evidenced by fatty spots on the hides and by grease stains. The mould and mildew of the external type were generally local spots on the outside. When the metal bands were taken from the bales, no water stains showed on the burlap or rust or water contact on the metal. Kemp's certificate was limited to an examination of twelve bales. He admitted that inherent vice as a possible cause of the damage had never been eliminated by him, then added that eventually he had eliminated it. He admitted that improper curing of the hides will bring out certain of the same conditions which he found present. If the hides are too moist when originally baled and shipped and not properly cured, it would be natural to expect a considerable deterioration and most of it in the internal part of the bale. But he said that the principal factor with him was the question of weight of the hides, and it was because of this condition that he eliminated inherent vice as a cause of the damage, for he found the shrinkage only normal.

On the other hand, the respondent's expert, Deevey, was of opinion that, if the bales had been submerged or subjected to extensive wetting, there would have been such an absorption of moisture as to result in an abnormal weight. Aside from the question of weight, if the hides had not been completely dried before baling, putrifaction was likely to set in.

Deevey was of opinion that the interior condition of the bales indicated that

they had not been thoroughly dried before being packed. Moreover, he said that a bale of China hides is so tightly packed as to prevent a slight wetting from reaching the interior of the bale and causing such a large percentage of damage as the survey revealed. Mould, in his opinion, is a sign of fresh hides and not necessarily any evidence of damage. This witness was particularly impressive, for he has bought most of the damaged cargoes of hides in New York, including those subjected to submersion in New York and in Colombia. He also examined the hides that had been shipped on the Morro Castle, and in all such cases of submersion he found the maximum percentage of damage not to exceed 6 per cent. He qualified the reference to the hides of the Morro Castle by saying that they were wet hides and not dry hides. Deevey was an impartial witness, and his conclusion that there was no exterior evidence that could be regarded as an indication of the damage found in the interior is most persuasive.

Pilcher, a cargo surveyor, testifying for the respondent, has examined part of the shipment in July, 1927. Looking over the bales generally, he found a heavy dry green mould on the outside of the bales. This green mould extended well into the side of the bales that were opened. Internally he found in some instances evidence of moisture but nothing to indicate a serious damage of that kind. At the time of his examination, it was uncertain what, if any, damage there was, and an agreement was reached that the libelant and the other surveyors were to be notified in the event that damage be developed. He testified that green mould is not necessarily a condition of damage; that it is frequently found on hides coming from the Far East, especially on cowhides or buffalo hides.

Some ten days later he attended another survey and saw some of the split hides that had been tanned. It was agreed that eight additional bales should be tanned and a further examination made, so he attended a third survey and found a further extensive damage of some pieces that had been included as previously sound. It was on the basis of figures then before them that he and Mr. Kohler for the libelant agreed that 71½ per cent. of the hides were damaged to the extent of 66⅔ per cent., leaving 28½ per

cent. of the hides sound. He found no such damage as Lichtman had referred to as on the outside of the bales where the hides were folded and no evidence of rust staining or rust damage, and none even from the steel bands on the hides, nor was any claim made of rust damage. This witness was of the opinion that there was an internal cause present at the time the hides were shipped. He too emphasized that the pressure under which the hides were baled would make it difficult for water to penetrate the interior from the outside without showing definite staining or marking on the outside of the bale, and, furthermore, that the steel bands would be rusted even though they had been covered with burlap.

Anderson, a cargo surveyor called by the respondent, boarded the vessel almost immediately after arrival, examined the tarpaulins, ventilation, dunnage, and stowage of cargo, and found the ceilings and compartments, including No. 7, lower hold, clean and dry. He found no evidence of dampness or damage in the cargo discharged from No. 7 hatch. This witness, giving his opinion as an expert, also held that the cause of the damage was from an internal condition, "possibly dampness before the bales were strapped up," he said.

Naylor, a cargo surveyor, testified for the respondent impleaded. He had been an importer of hides for thirteen years prior to becoming a surveyor in 1916. Green mould on bales of Chinese hides is not always an indication of damage, but is an indication of freshness of the hides. To the hypothetical question put to him, he expressed the opinion the hides were damaged and fresh when packed. This conclusion was reached because the moisture was confined to the center of the hide and sweating had set up in the center, and damage as extensive as that indicated to the center would have been attended with greater exterior evidence of contact with water, sufficient indeed to cause a change in the shape of the bales.

The witness Allen, called by the respondent impleaded, testified that he was a buyer and examiner of hides and skins, and concluded, from the facts stated in the hypothetical question, that the damage arose from improper packing of the hides; i. e., they were fresh, not properly cured. He also was of the opinion that, if the

damage had been due to external cause, most of the damage or rot would have shown on the exterior of the bale rather than in the interior.

From the foregoing testimony of the experts and surveyors, I conclude that this damage resulted from improper curing of the hides, and that the cause was antecedent to the shipment and was not observable when the bill of lading of the Dollar Steamship Company was issued. The libelant relies on The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, contending that the burden of proof is upon the respondent to prove the cause of the damage. Such is not a tenable argument, for the case is authority for the proposition that, when damage due to the carrier's fault is established, then the carrier has the burden of showing that other damage is due to a cause for which it is not liable. The libel should therefore be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.