## THE S. S. GLASGOW MARU.

## COMPANIA GENERALE DE TOBACOS DE FILIPINAS v. KOKUSAI KISEN KABUSHIKI KAISHA.

## WARNER, BARNES & CO., Limited, et al. v. SAME.

District Court, S. D. New York.

April 2, 1937.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Barton P. Ferris, both of New York City, of counsel), for Compania Generale de Tobacos.

Crawford & Sprague, of New York City (George C. Sprague, of New York City, of counsel), for Kokusai Kisen Kabushiki Kaisha.

KNOX, District Judge.

Libelants in the above-entitled suits ask damages from respondent upon account of injuries suffered by several shipments of centrifugal sugar that were transported from Manila, Nasugbu, and Bais, respectively, in the Philippine Islands, to Philadelphia and Savannah, upon board the steamship Glasgow Maru. While some of the shipments had different origins, their condition upon outturn at destination was much the same. This circumstance, coupled with the fact that all the sugar was carried by the same ship, made it expedient to consolidate the actions and try them as one.

Shortly before undertaking the voyage in question, the Glasgow Maru underwent an annual survey at a dockyard at Hikoshima, Japan. She was there inspected by Lloyds' representatives and received the classification of 100-A1. While in drydock, the iron work within the boat's hold was painted; bilges were dried and washed with cement; wooden floorings covering the tank tops were lifted and cleaned, and the tops of the tanks were scraped and dried with lime. Being certified as fit to carry dry and perishable cargo, the ship coaled

at Müke and proceeded to Manila, carrying bunker coal in the compartments of her No. 3 hold. Reaching the last-named port on February 25, 1934, she began to receive the Manila sugar shipments the following day. These were as follows: Two lots of 8,000 bags each from the Central Azucarera de Tarlac, marked C. A. T., and two further lots of similar sizes from Compania Generale de Tabacos de Filipinas, marked C. A.T./L. These latter shipments were stowed in the after part of No. 2 hold and 'tween decks, while the bags marked C.A.T. were placed in the forward portion of No. 4 hold and 'tween decks. Nothing of an untoward nature occurred at Manila, and when loading there was completed the vessel went to Nasugbu, 40 miles distant, anchoring 2 or 3 miles off shore. At this port the ship received four shipments of sugar from lighters, each lot being bound for Philadelphia as follows: Two from Central Azucarera, Don Pedro, one of 16,-064 bags and the other of 8,032 bags; and two lots of the same size from the Asociacion Cooperative de Ventas de Batangas. The mill from which these shipments came is some 10 miles from the loading point, and the sugar was conveyed to the seaboard on unprotected flat cars. Rain fell during the course of loading, and the bags of one lighter, when tendered the ship, were found to be wet and were rejected. Thereafter, following an attempt to dry some of the bags, they were again offered the ship. But, once more, these bags were refused. It is possible, nevertheless, that some wet sugar found its way into the holds.

Mention should be made that the bunker coal had now been removed from No. 3 hold. The space was swept and cleaned, but not washed down. Loading at Nasugbu was completed on the afternoon of March 4. The vessel then sailed for Bais, upwards of 400 miles distant, reaching that port on March 5. She there received six shipments of 8,000 bags each, all of which were destined for Savannah. Some of the sugar tendered at this port was found to be wet, and was rejected. Like the shipments at Nasugbu, transportation had been effected from an inland point on flat cars. They, however, had some protection from rain through the medium of sheets of galvanized iron. It is obvious, though, that such a covering would not adequately protect the sugar from a heavy rain storm. Loading of cargo at Bais ended at 4 o'clock p. m. on March 10, and within an hour the ship was

on her way to the east coast of America, via Honolulu, and Los Angeles.

In passing, it may be said that, with the possible lack of proper ventilation facilities, the physical equipment of the holds, as well as her dunnage, cargo battens, and the like, were all that reasonably could be expected.

The matter of ventilation, the basic issue in the case, and the facts in reference thereto being sharply in issue, the facilities by which it could be and was obtained, together with the effect thereon, as a result of the vessel being overladen for a part of the voyage, should have attention.

At the forward ends of Nos. 1 and 4 hatches, the vessel carries two moveable cowl head telescopic ventilators, measuring 18 inches in diameter at the upper 'tween decks and 8 inches in the lower holds. Near the after ends of these hatches, two hollow samson-posts, with mushroom heads, are located. These have a diameter of about 18 inches, and, as they pass through the shelter and 'tween decks, they are so arranged as to enable these compartments to receive some ventilation. In the lower holds, the spaces through which air may pass are smaller. Nos. 2 and 5 hatches have cowl ventilators near their after ends, and samson-posts with mushroom heads at the forward ends. In size and construction they are similar to those to be found in Nos. 1 and 4 holds.

By reason of the adoption by the United States of the recommendations of the International Load Line Convention, the drafts to which a vessel carrying cargo to this country may load are regulated by law (47 U.S.Stat. pt. 2, p. 2228). The summer deep load line of the Glasgow Maru is 27 feet, $1^{33}/_{100}$ inches. When she got away from Bais, which is in the tropics, the draft was 27'7" forward and 27'7½" aft. The day following departure the ship entered the Summer Zone and, according to her own calculation, she then had a mean draft of 27'6¼" and was approximately 5 inches over her Summer load line. The Master figures that the ship rose in the water about 1 inch a day, due to the consumption of fuel, food, and water. He contends that the ship would have been entitled to a deeper draft had he chosen to proceed south instead of slightly north of the parallel of latitude which limited his load line. He chose the more northerly route in order to avoid a group of unlighted

islands, which lie along the parallel, and near which there is a current with a set to the north. He had no wish to incur the risk of running aground. Respondent also argues that the ship experienced fair weather and smooth seas throughout the days to which the charge of overloading has any real substantiation and that, therefore, any fault upon this score made no contribution to the damages to the sugar, and should be disregarded. I favor this contention.

In the course of the voyage to Hawaii, the ship did not encounter heavy weather until March 19, and, if her Master is to be believed, the vessel had reached summer draft three days before. On the afternoon of the 19th a fresh breeze arose having a force of between 4 and 5 on the Beaufort scale. At this time the cowl ventilators were unshipped and the hatches closed. The ventilators so remained until March 31. Between these dates, fresh and strong breezes prevailed, but there were days on which the hatches could be, and were opened. Although reason for not making use of the ventilators on these occasions does not appear, I assume that the time and trouble required to restore the cowls and the uncertain weather conditions which might at any interval change so that another unshipping would be necessary were the causes of that condition.

Claim is made by respondent that from "March 18 to the 25th, and from April 2 to the 4th, rough seas prevailed, causing the vessel to labor and strain violently and ship quantities of water over the decks of the ship. On April 3, the heavy seas which broke over the decks * * * smashed the steering rod cover on the port side at No. 4 hatch." My consideration of the testimony leaves me a long distance from believing that any overriding of the vessel-marks that may have occurred on March 19, and subsequent thereto, made any contribution to the damage of libelant's sugar. Had the ship proceeded on a course of 45 to 50 miles south of the one taken, there would have been little or no question of her having had a proper draft for that latitude. As has been stated, she laid her course to avoid a danger that was quite as great as the one assumed. I should imagine the weather conditions that were found differed slightly, if at all, from those which would have been experienced in the zone that would have validated the vessel's draft. If it be that the ship was over her marks when rough weather ensued (and that may have been the fact), the margin was very narrow. So narrow in fact that it is extremely doubtful if the frequency with which water washed the decks, and the quantities that did so, would be increased thereby. Under these circumstances, I cannot find a causal relation between the alleged unseaworthiness of the vessel, if she were overloaded, and the injury to libelant's sugar. Overloading was not the proximate cause of damage to the sugar. The Francis Wright, 105 U.S. 381, 387, 26 L.Ed. 1100; May v. Hamburg, etc., Aktiengesellschaft, 290 U.S. 333, 353, 354, 54 S.Ct. 162, 168, 78 L.Ed. 348.

The conclusion just reached narrows the issue to the lack of ventilation that is said to have existed on the vessel over the days of the voyage from Honolulu to Philadelphia. Before discussing this matter, it is well to describe the out-turn of the sugar. With the exception of a relatively few bags, the damage to the sugar was confined to the sides of the bags stowed next to the shell plating in the wing tiers of all cargo compartments, and, to a minor extent, on the bottom sides of the bags in the lowest tiers at the turns of the bilges. For the most part the damage evidenced itself by a wet staining of the bags, together with some bleaching of the sugar, with resulting losses of weight and test. This type of impairment of sugar coming from the Philippines in 1934 was frequently found, and several of the instances are subjects of adjudication in this court. See The Nagisan Maru and Shohei Maru (D.C.) 14 F.Supp. 1010, 1936 A.M.C. 283. The following cases are now pending: Cofuku Maru, A 111–366; San Francisco Maru, A 111–328; Hakomesan Maru, A 110–312; Hakubisan-Maru, A 110–313; Naples Maru, A 111–202. So far as the present suits are concerned, the damage was occasioned, according to libelants' experts and cargo surveyors, by sweating caused by improper ventilation. They based their conclusions on the condition of the bags in the wing tiers of the vessel and along the turns of the bilges. The opposing experts and surveyors, who were not in entire accord as to the cause of the damage, attributed the deterioration to the migration of moisture from the sugar itself, or to a combination of inherent vice of the cargo with the natural humidity of the hold, or to sweat caused by different temperatures in the hold.

One of libelants' witnesses was Dr. Rice, Chief Chemist of the National Sugar Re-

fining Company. On being asked his opinion of the cause of the damage, he said he thought that the injury was not necessarily due, and probably was not due, to an inherently bad condition of the sugar, but to moisture accumulating on the outside of those (wing) tiers which permitted the growth of bacteria molds and wild yeasts. He thought the moisture had come from outside rather than inside the stow. He added that there is no moisture in properly manufactured sugar. In further support of the theories advanced by libelants' cargo surveyors, there is substantial evidence, apparently trustworthy, which indicates that when the ship reached Philadelphia, her cowl head ventilators had been unshipped, and their respective stumps plugged and housed down with canvas covers. It is further said that the cowls were stowed behind cargo in the holds, and from this I am asked to find that they were not in use throughout the trip across the Pacific, through the Canal and up the Atlantic to Philadelphia. The officers of the vessel say that the ventilators were unshipped when passing Cuba in order to avoid the possibility of sea water damage to the sugar from heavy weather that was anticipated on the last lap of the journey. In order to supply necessary ventilation, the officers assert that they made use of wind sails or chutes that were rigged to the ventilator pipes and that, through this medium an adequate substitute for the cowl ventilators was provided. The testimony is contradicted, in part at least, by the persons representing cargo interests, and who saw the ship on the day of her arrival at Philadelphia. At that time these witnesses say the vessel carried no wind sails. It does appear, however, that on March 7, 1934, the day following arrival, and after damage to the sugar was found, such ventilating equipment was in evidence. By way of corroboration of libelants' contention, as respects ventilation, the charge is made that the ship's log had been altered so as to show attention to ventilation throughout the voyage when, as a matter of fact, the official record of the trip, when it was first seen, contained no notation in respect thereto.

There is no question as to the existence of alterations in the log. Respondent says they were innocent in nature, and were made so as to overcome the linguistic shortcomings of the Japanese officer who wrote the original entries. Libelants argue that the changes were fraudulent in nature and made to cover up the vessel's deficiencies in the care of the cargo. In order to support this point of view, attention is directed to the fact that S. Suyenaga, third officer of the Glasgow Maru, was first examined on September 6, 1935. In the course of his interrogation, inquiry was made concerning the numerous erasures found in the rough log of the vessel. Although freely admitting the alterations, and averring that they had been made before the ship reached Philadelphia, he gave no reason for them. On the 15th of the following April, the depositions of Suyenaga and T. Iwata, the master, were again taken. Upon this occasion, it was stated that the erasures and alterations had come about inasmuch as portions of the rough log had been written by an elderly officer of the ship who had little knowledge of English, and that, in order to render the entries more grammatical, Suyenaga, who was better educated, rewrote them at the master's direction. Frankly, the condition of the logs gives me much concern. While now replete with statements having to do with ventilation of cargo, there is reason to believe that some, if not many of them, were not present when the ship reached Philadelphia. This much, at least, can be said from the testimony of the surveyor who, on behalf of both the cargo and shipowner, examined the logs when the vessel reached Savannah. His notes show nothing as to log entries concerning ventilation. The explanation as to handwriting and inept phrasing of entries made by the Chief Officer is not very convincing. The handwriting in rough logs for the most part is legible and understandable. Therefore, I find no good reason for the present condition of the logs. Were it not for the testimony of Albert H. Stein, a representative of the insurance firm of Curtin & Brockie, who, upon May 10, 1934, extended the master's protest as respects the entries having to do with ventilation, I should condemn the logs as unworthy of belief. The protest refers to several of the ventilation entries, and Stein says they appeared in the record when the logs were exhibited to him, and Stein seemed an honest witness. While the details of what he saw in the logs, and the statements heard from the ship's officers are naturally somewhat hazy in his recollection, I have difficulty in believing that all the log entries as to ventilation are pure fabrications—some of them, I think, were.

In further support of libelants' argument as to the absence from the logs, as

originally written up, of all ventilation entries, it is pointed out that upon the return voyage of the Glasgow Maru from Los Angeles to Yokahoma, she carried a cargo of cotton. That commodity, as is well known, is of heating quality. Notwithstanding, the log of that trip is without an entry as to ventilation of the vessel's holds. But this proves little. Assuming that the logs of that trip, as well as those of the voyage with which the court is concerned, were without entries as to ventilation, it does not follow that the cargo was not ventilated. Here was a first class ship, manned, so far as can be told, by competent and experienced officers. They were desirous, doubtless, of serving the interests of their owners, and knowing as they undoubtedly did, the necessity of ventilating cargoes, it is hardly conceivable that they failed to do so. At the same time there is a feature of the record which makes it impossible for the point to be summarily dismissed.

When Iwata, the Master, was first examined, the following appears from his deposition:

"Q. Did you see any bags of sugar that were damaged at destination? A. Oh yes, I saw at Philadelphia they discharged in stained condition.

"Q. What kind of stain? A. *That is sweat stain and I feel sorry for myself I did not endeavor to protect the cargo.*

"Q. Where did you find the sweat?

"Mr. Hill: May I have that last answer read?

"A. (repeated) That is sweat stain and I feel sorry for myself I did not endeavor to protect the cargo.

"The Witness: To protect the cargo from some moisture or sweat.

"Q. What do you mean that you felt sorry for yourself that you did not protect the cargo from moisture or sweat?

"Mr. Hill: I object to cross-examination of the witness.

"A. I want to tell that anyway—

"Mr. Hill: Note on the record that the witness hesitated for about 30 seconds to a minute.

"A. (continuing) Any how I don't know who discovered that but they say—they put bags in the warehouse and they hesitated to take in all, I asked them and they say the condition isn't quite good, so I feel very sorry for me.

"Q. Did you do everything you could to prevent from sweat— * * * A. Yes, I did. I want to state to you, after sailing from Panama I know the temperature is so much different in warm current and cold current, I told the chief officer we must do our best to protect them. * * * I sent the sailors to clean all dewdrops accumulated inside of the hold and take off them, and some dewdrops came down, I take off and change the mats with new mats. * * *

"Q. Now, Captain, was there any definite drop or change in temperature? A. So much, 35 degrees in one day. * * * That makes moisture in the hold."

When the Master was called at a later date and inquiry was made as to his meaning in giving the answer italicized above and which I am asked to construe as an admission against the ship, he replied, "I feel sorry for myself, I did much endeavor to protect the cargo." I cannot coincide with libelants' view of the Captain's testimony. My primary reason for differing with libelants is that ship-masters are not prone to admit fault, however glaring it may be. Secondly, the Master is a Japanese, and although I have neither seen nor heard him, he does not appear to speak English with fluency. I have little doubt but that his explanation was the thought intended to be conveyed when he was first examined.

Libelants further say that, assuming the ventilation entries now appearing in the logs to be correct, they show the hatches to have been open on days of inclement weather. On the face of some of the entries between March 12 and May 12 this is true. Nevertheless squalls do not necessarily cause the deck of a ship to be washed with water or dashed with spray. Neither does rain, though it falls heavily, always enter a properly trimmed cowl ventilator. In any event, the proof is certain that no damage came to the sugar by reason of sea water. The most that properly can be claimed is that open hatches and ventilators during periods of damp weather tended to produce greater moisture in the holds than otherwise would have been caused. So far as fog and misty weather are concerned, it seems to have been experienced most noticeably from May 2 to May 5, when, according to libelants' theory, the hatches and ventilators were closed. If weather such as was experienced along the Atlantic Coast was inherently detrimental to cargo, as appears from the testimony of Dr. Rice, a lack of

ventilation, rather than a maximum thereof, would be beneficial to the cargo.

But, in giving thought to all that occurred or did not occur upon the voyage, there is an absence of proof as to one factual element that, in my judgment, is highly important. It has to do with the condition of the shipments of sugar when they went into the holds of the ship. Aside from the admission contained in the bills of lading that the shipments were received on board the Glasgow Maru in apparent good order and condition, there is nothing in the record which shows the actual condition of the cargo when it went into the ship. It has been established, beyond peradventure, that the process of manufacture of sugar, the treatment it received upon completion of manufacture, as well as the vicissitudes to which the commodity was subjected between the time of manufacture and its stowage in a ship, may affect its quality in the course of a voyage of many days, and extending half way 'round the world. Warm bagging and subjection to rain—and rain in the tropics is frequent and heavy—may be quite as productive of the presence of evidences of moisture, as lack of ventilation on the ship that carries the cargo. No assumption that the sugar was properly treated and protected prior to shipment can be indulged. If the sugar was damp at the time of shipment, the moisture was sure to manifest itself in the vessel's hold, and that manifestation, according to the experts, would be shown in the wings of the ship, and upon the lower tiers of the stow. Before a decree of improper care upon the part of the ship can go against respondent, the court must be able to find that the sugar, at the time of shipment, was itself free of vice. In this case that cannot be said.

It is to be remembered that the Glasgow Maru in performing her engagements with libelants passed through a variety of weather conditions ranging from the heat of the tropics to considerably lower temperatures. As Dr. Rice stated at the trial upon a failure to remove humid air from the hold, if there were changes of temperature, there would be precipitation of some of that humidity upon the bags, or upon the sugar. It is difficult for me to see how this vessel, under all circumstances, could exercise care sufficient to avoid considerable sweating in the holds. Indeed, I think the facts here are such as to bring the case within Clark v. Barnwell, 12 How. (53 U.S.) 272, 13 L. Ed. 985.

As presently stated, the outturn of the sugar from the Glasgow Maru was much like that of cargoes of Philippine sugar from off the Nagisan Maru in 1932, and Shokei Maru in 1933, and which were subjects of litigation before Judge Patterson. He found the damage to have arisen from inherent vice of the commodity.

In this connection, attention may be called to the testimony of Charles T. Theus, a surveyor at Savannah, who testified for respondents, but who, also, surveyed the Glasgow Maru and her cargo on behalf of both owners and consignees. After saying that he believed the damage to have resulted from climatic or atmospheric conditions brought about by certain changes in the temperatures inside and outside the ship while on the voyage, he stated that in 1933 and 1934 there was "quite a run of cargoes from the Philippines in which there were very few exceptions, as a matter of fact almost all of them had identically the same kind of condition, as regards the sugar." He specifically named the San Francisco Maru, and the Queen City, a British boat. On being asked the number of ships from the Philippines he had inspected, and the cargoes of which had shown damage of the character of that of the sugar on the Glasgow Maru, he said approximately ten. He found nothing wrong with the ventilating equipment of the ship and said that if it had been kept open on favorable days that that was all the ship could do in the matter of ventilation. As heretofore said, Mr. Theus examined the vessel's log when he went aboard at Savannah and made notes of what he found, but they show no reference to the log having indicated the facts concerning ventilation of cargo during the voyage. He was interested primarily in the periods of heavy weather experienced by the ship. He was told, however, by both the Captain and his chief officer that "on every occasion whenever the weather permitted, that the hatches were opened and vents trimmed; on the voyage across there were certain times that the weather required the closing of both."

While I am not prepared to conclude, as did Judge Patterson in the cases before him, that the damage here was due to inherent vice of the sugar, I am reasonably certain that it was brought about either from that cause or by sweat, or possibly,

**536**

a combination of both. In any such event, the occasion for the injury is covered by exceptions contained in the bills of lading, or is excused by the operation of law. There being no satisfactory proof that the ship was negligent as respects ventilation of cargo, there is no alternative than to dismiss the libels.

As against this result libelants argue that the decision in Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, relieves them of affirmatively establishing negligence on the part of the ship, saying that respondent must bring the damage within an exception to the bill of lading and that failure so to do will impose liability upon her. It is my belief that this decision does not qualify the rule announced in Clark v. Barnwell, supra. See the decision of Judge Inch of the Eastern District of New York (February 7, 1936), in Lichtman & Sons v. Dollar Steamship Line (D.C.) 13 F.Supp. 717.

This opinion is probably too long. It has become such by reason of my desire to respond to the earnestness and conviction of counsel who presented their opposing viewpoints. Much more might be said, but I must refrain from further discussion.

Libels dismissed.